## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

**MARILYN HARTWELL,**

     **Plaintiff,**

**vs.**                                                       **Case No. 15 CV 1103 JAP/GJF**

**SOUTHWEST CHEESE COMPANY, LLC,**

     **Defendant.**

### MEMORANDUM OPINION AND ORDER
### GRANTING IN PART AND DENYING IN PART
### DEFENDANT'S SECOND MOTION TO DISMISS AND TO STRIKE

In DEFENDANT'S SECOND MOTION TO DISMISS AND TO STRIKE (Doc.

No. 19) (Motion), Southwest Cheese Company, LLC (SWC) asks the Court to dismiss

several of Plaintiff Marilyn Hartwell's claims and strike portions of Plaintiff's FIRST

AMENDED CIVIL COMPLAINT FOR DISCRIMINATION IN EMPLOYMENT

UNDER NMHRA; SEXUAL HARASSMENT UNDER TITLE VII; BREACH OF

IMPLIED IN FACT CONTRACT; RETALIATORY DISCHARGE; INTENTIONAL

INFLICTION OF EMOTIONAL DISTRESS; NEGLIGENT SUPERVISION;

VIOLATION OF 42 U.S.C. § 1981 (Doc. No. 14) (FAC).[1] The Court will grant the

Motion in part and will dismiss some of Plaintiff's claims. The Court will also grant

SWC's request to strike one paragraph of Plaintiff's FAC.

---

[1] After SWC filed its Motion, Plaintiff filed PLAINTIFF'S MOTION TO FILE SECOND AMENDED
COMPLAINT (Doc. No. 32) (Motion to File). However, the Motion pertains to Plaintiff's FAC. SWC has
opposed the Motion to File and has requested that the Court rule on the Motion first and then rule on the
Motion to File. The Court will grant SWC's request and rule on the Motion first.

I.      STANDARD OF REVIEW

SWC moves to dismiss under Rule 12(b)(6) and moves to strike under Rule 12(f). "The court's function on a Rule 12(b)(6) motion is . . . to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002). In evaluating a Rule 12(b)(6) motion, the court must "accept as true all well-pleaded facts [in the complaint], as distinguished from conclusory allegations, and view the facts in the light most favorable to the nonmoving  party. . . ." *Archuleta v. Wagner*, 523 F.3d 1278, 1282–83 (10th Cir. 2008) (quotation and alteration omitted). Even though the court must accept as true all well-pleaded facts in the complaint, the court is under no obligation to accept bare conclusory allegations. *Hall v. Belmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Nor is the court required to accept legal conclusions without factual support. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To summarize, a complaint must contain sufficient factual allegations "to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true. . . ." *Twombly*, 550 U.S. at 555.

In deciding a Rule 12(b)(6) motion, a court typically may consider only the facts alleged in the complaint**.** *Martin v. Central States Emblems, Inc.*, 150 F. App'x 852, 857 (10th Cir. Oct. 11, 2005) (unpublished) (citing *County of Santa Fe v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002)). However, a court may consider the documents from administrative proceedings as undisputed documents referenced in the complaint without converting the motion to dismiss into a motion for summary judgment.

*Id.* at 858 (citation omitted) (stating that courts may consider charge filed with Equal Employment Opportunity Commission in ruling on motion to dismiss).

Under Rule 12(f), a court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Generally speaking, motions to strike should be denied unless the challenged allegations "have no possible relation or logical connection to the subject matter of the controversy." 5C The Late Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, Adam N. Steinman, *Federal Practice & Procedure* § 1382, at 433–36 (3d. ed. 2004). While motions to strike are generally disfavored, the decision to grant a motion to strike is within the discretion of the court. *Burget v. Capital West Securities, Inc.*, No. CIV–09–1015–M, 2009 WL 4807619, *1 (W.D. Okla. Dec. 8, 2009) (citing *Scherer v. United States Dep't of Educ.*, 78 F. App'x 687, 689 (10th Cir. 2003)).

## II.   FACTUAL ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

Plaintiff is a 60 year old African-American woman. (FAC ¶ 2.) SWC operates a plant that processes cheese and dairy products in Clovis, New Mexico. (FAC ¶ 3.) Plaintiff was hired by SWC on May 24, 2006, and she worked for SWC until SWC terminated her employment on June 20, 2014. (FAC ¶ 9.)

On May 2, 2014 prior to her discharge, Plaintiff submitted a Charge of Discrimination (Charge) with the New Mexico Department of Workforce Solutions, Human Rights Bureau. (FAC Ex. 1.) In her Charge, Plaintiff stated the following:

> STATEMENT OF HARM: I've been employed by the Respondent since 5/2006 and my current title is Lab Tech. In 1/2014 I applied for the position of Quality Assurance and the position was given to a much younger, White employee. In addition, I was suspended in 1/2014 but I do not believe the suspension was legitimate and I believe this was done due to my Race (Black).

> STATEMENT OF DISCRIMINATION: I believe I have been discriminated against due to my Race (Black) and sex (Female) and this is in violation of Title VII of the Civil Rights Act of 1964, as amended. I have also been discriminated against due to my age (57) and this is in violation of the Age Discrimination in Employment act [sic].

*Id.*

On July 4, 2014, Plaintiff received a letter from Leah Jackson, SWC Human Resources employee, informing Plaintiff that she was terminated effective June 20, 2014 for job abandonment. (FAC ¶ 36, Ex. 4.) The specific allegations about Plaintiff's discharge are described below in Part II. D.

In her first claim, Plaintiff contends she was subjected to unlawful sexual, racial, and age harassment in violation of the New Mexico Human Rights Act (NMHRA). (FAC ¶¶ 43–49.) In her second claim, Plaintiff alleges she was sexually harassed in violation of Title VII, 42 U.S.C. § 2000e-2(a). (FAC ¶¶ 50–55.) In her third claim, Plaintiff alleges that SWC breached Plaintiff's oral employment contract by firing her without good cause. (FAC ¶¶ 56–61.) In her fourth claim, Plaintiff alleges that she was discharged in retaliation for filing a workers' compensation claim or in retaliation for complaining to authorities about workplace safety. (FAC ¶¶ 62–67.) In her fifth claim, Plaintiff asserts a claim for intentional infliction of emotional distress (IIED) alleging that SWC failed to protect her from sexual harassment and other offensive conduct. (FAC ¶¶ 68–72.) In her sixth claim, Plaintiff asserts a claim of negligent supervision for SWC's failure to supervise employees who sexually harassed Plaintiff. (FAC ¶¶ 73–83.) In her seventh claim, Plaintiff alleges that SWC racially discriminated against her in violation of 42 U.S.C. § 1981 because SWC failed to promote her, tolerated a racially hostile work environment, discharged her, and treated her less favorably because of her race. (FAC ¶¶

84–92.) In her eighth claim, Plaintiff alleges SWC discriminated against her because of her age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1). (FAC ¶¶ 93–97.)

        A.     General allegations of mistreatment, injury, and retaliation.

Plaintiff claims at all times she was performing her job duties satisfactorily. (FAC ¶ 42.) Plaintiff alleges that in 2013, an unnamed employee made an accusation against a truck driver, but when Plaintiff would not join in the accusation, George Chappell, SWC President, "tried to get her written up." (FAC ¶ 13.)

On October 2, 2013, Plaintiff was injured "when a door slammed into her." (FAC ¶ 15.) Plaintiff was taken to the office to see Debbie Abrego, the Safety Manager. In Ms. Abrego's office, firefighters and paramedics were receiving training. (*Id.*) Ms. Abrego asked the trainees "what they thought of [Plaintiff's] injury." (*Id.*) "One of the men opined that he did not think [Plaintiff] was injured. Travis Martin then told Plaintiff to get back to work. Plaintiff demanded to be taken to the hospital to be x-rayed." (*Id.*) "Plaintiff was released to return to work." (FAC ¶ 16.)

On October 30, 2013, fire alarms went off in the SWC plant. Justin Musick, a supervisor, "told Plaintiff that if she left her work area she would be terminated." (FAC ¶ 17.) On November 4, 2013, Plaintiff filed a complaint with the New Mexico and Federal Occupational Safety Health Administration regarding unsafe conditions at SWC, "including two anomia [sic] leaks that employees were not made aware of that threatened their lives; fire alarms going off in the building; employees being reluctant to report injuries due to retaliation and harassment; and employees being exposed to chemicals for cleaning trucks." (FAC ¶ 18.)

On November 18, 2013, Plaintiff received a letter from the New Mexico Occupation and Safety Bureau stating that "the unsafe working conditions have been corrected." (FAC ¶ 19.) SWC's entire plant "had to be re-wired because of corroded wires." (FAC ¶ 20.) Plaintiff alleges that SWC retaliated against her for making the safety complaint: (1) Plaintiff was called into her supervisor's office for "petty work rule violations;" (2) Plaintiff was falsely accused of incorrectly taking milk samples; (3) Supervisors Eric Denton and Justin Musick "watched Plaintiff's work performance on a daily basis[;]"(4) Plaintiff was accused of "not taking milk tankers into the plant in a timely fashion[,]" a job for which she was not responsible; (5) Plaintiff was referred to contemptuously as a "whistleblower" by Mr. Musick, Mr. Denton, and other supervisors; and (6) Mr. Musick stated "that nigger . . . is not going to get away with this [the safety report]." (FAC ¶¶ 18, 20 i–v.)

        B.    Allegations regarding Plaintiff's write-up and suspension for tongue ring.

On January 8, 2014, Plaintiff was called into a supervisor's office by three supervisors, Mr. Denton, Mr. Musick, and Mr. Campbell, and Plaintiff was "forced to open her mouth to see if she had a tongue ring." (FAC ¶ 21.) "Plaintiff stated that she was being sexually harassed and she was not opening her mouth." (*Id.*) Plaintiff complained to HR employee Leah Jackson about the sexual harassment, but Ms. Jackson told Plaintiff she would have to make an appointment. (*Id.*) The next day, Plaintiff called Ms. Jackson, but she refused to see Plaintiff. Leah Jackson told Plaintiff "that the issue was between Plaintiff and management (3 white males)." (*Id.*) Plaintiff asserts that "[t]his write up was in retaliation for Plaintiff making a work place safety complaint to the

Occupational Health and Safety Bureau. Other white females on the floor wore tongue rings but were not harassed the way Plaintiff was harassed." (*Id.*)[2]

On January 20, 2014, Plaintiff was called into Ms. Jackson's office and was "given a 'write up' for not shaking milk samples with both hands despite Plaintiff's right arm being injured." (FAC ¶ 23.)

On January 31, 2014, Plaintiff was called into Mr. Denton's office and was given a disciplinary write-up "because Plaintiff wore a tongue ring." (FAC ¶ 24.) For the same reason, Plaintiff was suspended without pay on February 10, 11, and 14, 2014. (*Id.*) Similarly situated white female employees with tongue rings including "Ashley May, Manie Collins and Tammy Pruiser were not disciplined by SWC, or subjected to humiliating inspections." (*Id.*)

C. Allegations regarding failure to promote.

In January 2014, Plaintiff applied for a Quality Assurance job. (FAC ¶ 22, Ex. 1.) "A white male was given the job despite the fact that he had never worked in a cheese plant and was not as qualified as Plaintiff. Plaintiff was denied the promotion because of her status as a female African-American and her age." (*Id.*)

D. Allegations of Plaintiff's workers' compensation claim, FMLA leave, return to work, and discharge.

On March 27, 2014, Plaintiff applied for workers' compensation and took leave under the Family Medical Leave Act (FMLA).[3] (FAC ¶ 25.) On June 6, 2014, "Plaintiff

---

[2] It appears Plaintiff alleges that this incident was an example of retaliation for making a safety complaint, sexual harassment, race discrimination, and age discrimination.

[3] Under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601-54, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

was released back to work with restrictions by Plaintiff's physician." (FAC ¶ 26, Ex. 3.) However, "Plaintiff was told not to come to work because Human Resources needed to see Plaintiff on June 9, 2014." (FAC ¶ 27.) On June 9, 2014 in the late morning, Ms. Jackson and Mr. Denton told Plaintiff to go home "because they needed to call Plaintiff's physician and that Plaintiff should call Human Resources every day." (FAC ¶ 28.) Plaintiff "started calling every day until June 18th, 2014." (FAC ¶ 29.)

On June 18, 2014, Ms. Jackson, Mr. Denton, and Ms. Abrego signed Plaintiff's work release indicating that they were "aware of restrictions" and that they agreed that "these restrictions can be accommodated." (FAC ¶ 31, FAC Ex. 3.) The restrictions listed were "[n]o bending, lifting twisting or turning" and "[n]o lifting more than 20 lbs." (FAC Ex. 3.)  Plaintiff worked on June 18, 19, and 20, 2014 in the laboratory. (FAC ¶ 31.)

On June 20, 2014, Plaintiff was called into Ms. Abrego's office. Ms. Abrego "stated that Plaintiff needed to leave because Defendant was not going to accommodate Plaintiff's work restrictions." (FAC ¶ 32; Ex. 5.) Plaintiff was given a memo stating that Ms. Abrego was "asking [Plaintiff] to discontinue work due to her having concerns about the position in which she had been assigned for her accommodation for her workers [sic] compensation case." (FAC Ex. 5.) The memo stated that Ms. Abrego "reviewed all the current available tasks . . . All the tasks suggested will cause further aggravation and pain. . . . At this time, I am unaware of any transitional duties that will not cause further harm." (*Id.*) Ms. Abrego's memo stated that she told Plaintiff "to go home since we cannot accommodate at this time." (*Id.*)

Plaintiff alleges that SWC had accommodated white employees with work restrictions by "placing them in front office positions." (FAC ¶ 33.) However, "SWC

refused such an accommodation because of Plaintiff's status as a female African-American." (*Id.*) It was "well known by Plaintiff and others that any African-American or Hispanic" who was injured on the job "was terminated." (FAC ¶ 34.)

On July 1, 2014, Plaintiff received a telephone call from Ms. Abrego "asking Plaintiff to come in." (FAC ¶ 35.)

On July 4, 2014, Plaintiff received a letter from Ms. Jackson, informing Plaintiff that her job was terminated effective June 20, 2014:

> Marilyn, you had an appointment scheduled with Debbie Abrego and me for Monday June 30, 2014 at 10am [sic]. You called Debbie to cancel that appointment on Friday, 6/27/14. You advised Debbie that you would call Monday afternoon to schedule an appointment with us on Tuesday, 7/1/14. You did not contact her. Since we did not hear from you, we made five attempts to contact you regarding your continued employment at Southwest Cheese. You have not returned our calls from 7/1, 7/2 and 7/3. As we discussed several times, you exhausted your FMLA protection on 6/20/14. Therefore, effective immediately, your employment is terminated due to job abandonment.

(FAC ¶ 36, Ex. 4.)

### E.    Allegations of sexual harassment.

Plaintiff asserts that she "was discriminated against because of her gender which was sufficiently severe and/or pervasive such that it altered the terms and/or conditions of her employment and created an abusive working environment[.]" (FAC ¶ 38.) In 2007, Paul Conrow, a manager, grabbed Plaintiff from behind and squeezed her buttock at an SWC Christmas party. (FAC ¶ 38 i.) In 2007, Lonnie Hudson, a manager, grabbed Plaintiff from behind while at work. (FAC ¶ 38 ii.) "Plaintiff was taken off the night shift and her pay was reduced." (*Id.*)

Plaintiff saw several supervisors, including Team Leader Donnie Romero, Production Manager Ricardo Rivas, Team Leader Jose Borjas, and Team Leader Johnny

Ortiz, go onto the "VAT deck" at SWC and "hose female employees [sic] shirts down with water so as to expose their undergarments and the outline of their female anatomy on a frequent and continuous basis during her employment at SWC." (FAC ¶ 38 iii.) Plaintiff was "sprayed with water by a Team Leader, Danny Garcia, while on the 'VAT deck' causing her extreme embarrassment and humiliation." (FAC ¶ 38 iv.) "Plaintiff was sprayed with water" by Mr. Romero "on average at least three times a week during her employment with SWC until approximately May, 2014 when [Mr. Romero] was terminated[.]" (FAC ¶ 38 v.)

"In 2007-08 Plaintiff complained to Brenda Miller . . . about the water spraying." (FAC ¶ 38 vi.) "Brenda Miller said a letter would be issued, but Plaintiff never saw the letter and the spraying continued to occur against Plaintiff and other female employees in her presence." (*Id.*) Plaintiff was continuously afraid to go on the VAT deck "for fear of being hosed down with water like an animal by Team Leaders in order to satiate Team Leaders [sic] perverted fetishes throughout the term of her employment which materially changed the terms and conditions of her employment." (FAC ¶ 38 vii.)

Cody Stewart referred to his genitals as his "brain" in front of Plaintiff and other females. (FAC ¶ 38 ix.)

"Steven Campbell (a white male) stalked Plaintiff continuously on the job." (FAC ¶ 38 x.)

Assertive women were disparagingly referred to as "lesbians" and their sexual identity [was] questioned in front of Plaintiff. (FAC ¶ 38 xii.)

F.      Allegations of racial disparate treatment and racial harassment.

In 2013, Plaintiff took the lab tech examination. (FAC ¶ 14.) Plaintiff alleges that the examination "was given to three white employees in a room where the answers to the examination were posted. Plaintiff was forced to take the examination in a different room in front of a SWC employee who accused her of cheating. Plaintiff passed the examination and was given the job of lab tech." (*Id.*)

SWC had a "custom, routine and practice of discriminating against African-Americans and females" by disciplining them more severely than similarly situated males. (FAC ¶ 39.) African-Americans were suspended and/or terminated for "talking back" while similarly situated white employees were not. (*Id.*)

Team Leader Danny Garcia used the racial epithet "nigger" (referred to as the n-word) on a frequent and continuous basis during Plaintiff's employment. (FAC ¶ 40 i.) Tony Garza used the n-word in front of Plaintiff. (FAC ¶ 40 ii.) Plaintiff heard the n-word in the break room and racial jokes about African-Americans were told in front of Plaintiff, which "embarrassed and humiliated her." (FAC ¶ 40 iii.) Plaintiff attempted to report this racially offensive behavior to the HR Manager Brenda Miller, "but nothing was done." (FAC ¶ 40 iv.)

"In 2009, SWC employee Tim Rogers (a white male SWC employee), called truck drivers the 'n-word.'" (FAC ¶ 40 vii.) After a meeting with the trucking company, SWC President George Chappell not only refused to fire Mr. Rogers, but walked into the lab and shook Mr. Rogers' hand and promoted Mr. Rogers to a job in the front office. (*Id.*)

After Plaintiff made the report about the safety of the SWC plant in November 2013, Plaintiff overheard Mr. Musick state, "that nigger . . . is not going to get away with this. . . ." (FAC ¶ 18.) Mr. Musick made an offensive racial joke about the President of the United States. (FAC ¶ 40 vi.)

African-Americans employed at SWC were treated "much more harshly" than white or Hispanic workers. (FAC ¶ 40 v.) One African-American worker, Josh Ford, was suspended for two weeks for "talking back to the Production Manager's wife in 2014." (*Id.*) The same worker was demoted for "being 2 minutes late for a meeting." (*Id.*) "White male workers who questioned or 'talked back' to management or were late or no shows to meetings were not terminated or disciplined." (*Id.*)

In 2013, Plaintiff was instructed "not to bring her lunch pail into the locker room or take her lunch down the blue hall way [sic]." (FAC ¶ 40 ix.) Plaintiff was forced to walk outside to eat her lunch. (*Id.*) The same rule was not enforced against white employees. (*Id.*)

In 2014, Plaintiff's supervisor, Mr. Denton, tried to write up Plaintiff for having an unopened soda can in the break room, but another employee, Perla Tarango, kept several sodas and food in the break room refrigerator. (FAC ¶ 40 viii.)

In February 2014, Plaintiff applied for Production Manager, but a "white male who Plaintiff had trained in the lab was hired despite having less [sic] qualifications than Plaintiff." (FAC ¶ 41 i.)

Plaintiff was the only person on the VAT deck required to relieve lab operators for breaks and lunch. This required a long walk allegedly designed to harass Plaintiff as an African-American female. (FAC ¶ 40 x.)

"A white employee threatened to kill Plaintiff." (FAC ¶ 38 xi.)

      G.     Allegations of age discrimination.

Plaintiff claims she was discriminated against due to her age because much younger, less qualified employees were chosen for job promotions over Plaintiff. (*See generally* FAC ¶ 41.) In paragraph 22 of the FAC, Plaintiff states that she applied in 2014 for a position as Quality Assurance, but a white male was given the job "despite the fact that he had never worked in a cheese plant and was not as qualified as Plaintiff. Plaintiff was denied the promotion because of her status as a female African-American and her age." (FAC ¶ 22.)

Plaintiff's allegations related to age discrimination are listed paragraph 41 of the FAC. In 2013, Plaintiff applied for Assistant Team Leader, but a 22 year old white woman was hired "despite the fact she had been there only three weeks and was not as qualified as Plaintiff." (FAC ¶ 41 ii.) Danny Garcia, the Team Leader, "said Plaintiff was too old for the job because Plaintiff would have to walk up stairs." (*Id.*) Also, in 2013, Plaintiff applied for Assistant Quality Assurance of production, but a "26-27 year old female . . . was hired despite Plaintiff being more qualified." (FAC ¶ 41iii.) Again in 2013, Plaintiff learned that SWC was going to open another lab position for an Assistant Team Leader "which was then closed to Plaintiff when she indicated an interest in the job." (FAC ¶ 41 iv.) SWC did not advertise internal promotions, and Plaintiff was not considered for these promotions "based on her age." (FAC ¶ 41 v.)

Plaintiff asserts that she asked several management employees to give her a "decent chair to sit in for her work." (FAC ¶ 41 xi.) But, Plaintiff was given a chair with

"protruding metal edges with duct tape." (*Id.*) Younger white female employees working in the front office "were given $1000 dollar [sic] chairs (each) to sit in." (*Id.*)

In 2011 and again in 2014, "Plaintiff was informed that if she did not come back to work soon she would be replaced by a younger worker." (FAC ¶ 41 xiii.)

III.   DISCUSSION

A.   Plaintiff failed to exhaust her first and second claims for racial, age, and sexual harassment.

1.   Plaintiff's harassment claims under the NMHRA were not exhausted.

Under the NMHRA, Title VII, and the ADEA, a claimant must exhaust administrative remedies before filing suit. *See Shikles v. Sprint/United Management Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005) (recognizing that ADEA and Title VII require exhaustion of administrative remedies); *Luboyeski v. Hill*, 117 N.M. 380, 872 P.2d 353, 355 (1994) ("[W]hen a defendant is sued under the [New Mexico] Human Rights Act the plaintiff must exhaust her or his administrative remedies before bringing an action in district court."). Requiring a claimant to exhaust the administrative process "put[s] an employer on notice of a violation prior to the commencement of judicial proceedings . . . [and facilitates] internal resolution of the issue rather than promoting costly and time-consuming litigation." *Mitchell v. City and County of Denver*, 112 F. App'x 662 (10th Cir. 2004) (citation omitted) (unpublished).[4]

─────────────────

[4] In *Gad v. Kansas State Univ.*, one panel of the Tenth Circuit Court of Appeals concluded that failure to exhaust should be treated as a condition precedent to suit and not as a jurisdictional prerequisite to suit. 787 F.3d 1032, 1039–41 (10th Cir. 2015). *See also Arabalo v. City of Denver*, 625 F. Appx 851, 859–61 (10th Cir. 2015) ("As a condition precedent to suit, even if not a jurisdictional prerequisite, Arabalo was required to notify the CCRD and the EEOC of the alleged rape before she could later rely on it in support of her hostile-work-environment claim.").

A plaintiff must file a charge of discrimination with respect to each discrete instance of discrimination or retaliation. *Apsley v. Boeing Co.,* 691 F.3d 1184, 1210 (10th Cir. 2012). When a court considers whether a plaintiff has exhausted administrative remedies with respect to a specific claim, the court looks to the "scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge. In other words, the charge must contain facts concerning the discrimination and retaliatory actions underlying each claim." *Jones v. UPS, Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007). In *Apsley*, the Tenth Circuit upheld the dismissal of a retaliation claim because an employee's charge only mentioned "discrimination" as the basis for the charge. *Apsley*, at 1210. ("[n]othing in the EEOC forms put the [employer] on notice of retaliation claims relating to gender, race, or disability.").

To exhaust a hostile work environment claim, a claimant's charge must describe a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment[.]'" *Hunt v. Riverside Transp., Inc.*, 539 F. Appx 856, 859 (10th Cir. 2013) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks omitted)). In *Hunt*, the Tenth Circuit upheld the dismissal of a claim that plaintiff was subjected to a racially hostile work environment because the narrative portion of his charge did not "adequately describe a hostile work environment." *Id.* The Tenth Circuit reasoned that "Mr. Hunt's hostile work environment claim could not reasonably be expected to follow the allegations contained in his charge." *Id.* (citing *Jones v. UPS, Inc.,* 502 F.3d at 1187). Mr. Hunt's charge described a

manager's comment that they would "put [a] mop handle up [Mr. Hunt's] butt and make a fudge sickle out of [him]," and that a human resources supervisor "talk[ed] down to [him]" and "fuel[ed] hostility." *Id.* at 857. The court concluded that "Mr. Hunt did not specify that he was complaining of a hostile work environment nor did the narrative portion of his charge adequately describe a hostile work environment." *Id.* at 859.

SWC correctly points out that only two discrete discriminatory acts were described in Plaintiff's Charge: (1) the January 2014 failure to promote Plaintiff to a Quality Assurance position; and (2) the January 2014 suspension for wearing a tongue ring.[5] SWC asserts that because only two events are described in the Charge, Plaintiff should not be allowed to present any other events in support of her claims for race, sex, and age discrimination under the NMHRA, Title VII, and the ADEA.

Plaintiff urges that Court to "look beyond the formalities of the complaint form." According to Plaintiff, the narrative of Plaintiff's Charge "complains of a hostile work environment over a period of time[.] (Resp. at 7-8.) However, the Court can find no reference to a hostile work environment in Plaintiff's Charge. Nor does the Charge contain a description of events that may be construed as creating a hostile or abusive work environment. In fact, words such as "hostile work environment," harassment" or "abuse" do not appear in the Charge or in the attached EEOC Intake Questionnaire. (FAC Ex. 1.) The Charge does not mention that Plaintiff and other females were sprayed with water or that racially hostile words like the "n-word" were used by employees at SWC. The Court does not see how Plaintiff's Charge would lead to an investigation of sexual, racial, or age-related harassment.

---

[5] In her FAC, Plaintiff alleged she was suspended in February 2014; however, in her EEOC Charge, Plaintiff claims she was suspended in January 2014. The discrepancy does not affect the Court's analysis.

In *Mitchell v. City and County of Denver*, an African-American plaintiff alleged in his court complaint that his employer racially discriminated against him by promoting Caucasian employees more quickly and by giving Caucasian employees more favorable work assignments. 112 F. App'x at 664. The plaintiff also asserted claims for racial harassment/hostile work environment. *Id.* at 665. In his administrative charge, however, the plaintiff had only alleged racial discrimination for his employer's failure to promote him. *Id*. The district court granted summary judgment in favor of Denver Water, one of the defendants, and dismissed the plaintiff's racial harassment/hostile work environment claim for failure to exhaust administrative remedies. *Id.*

The Tenth Circuit noted that an employee's judicial complaint "may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." *Id.* citing *Martinez v. Potter,* 347 F.3d 1208, 1210 (10th Cir. 2003) (quoting *Ingels v. Thiokol Corp.,* 42 F.3d 616, 625 (10th Cir.1994)). But, the court recognized that a claim is considered "reasonably related" when "the conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge that was made." *Id.* (citing *Deravin v. Kerik,* 335 F.3d 195, 200–01 (2d Cir. 2003)). The Tenth Circuit carefully considered the language used and the boxes checked in Mitchell's administrative charge. In the section titled "Cause of Discrimination," Mitchell checked the boxes marked "race" and "retaliation." *Id.* at 667. In the section titled "Date of Discrimination," he checked the box marked "continuing action;" however, in that same section, he indicated only one date as the date of discrimination. *Id.* In his statement of "Personal Harm," Mitchell wrote:

> Denver Water "fail[ed] to promote me . . . because of my race/African
> American ... and in retaliation for engaging in protected activity." . . .
> [Mitchell alleged]: (1) he had always been a "satisfactory to above-
> satisfactory" employee, (2) three Caucasian males with less seniority and
> experience had been promoted in the last six months, (3) throughout this
> period he had consistently complained to his superiors regarding what he
> perceived to be discriminatory treatment, (4) he had filed a previous charge
> of discrimination . . ., (5) [Supervisor] Funk allegedly stated, "this nigger
> [Mitchell] ain't going anywhere as long as he works for me," and (6) he
> remained employed "at a lesser step than he should be."

*Id.* (citations to appellate record omitted). The Tenth Circuit concluded that a liberal

construction of the plaintiff's charge could not have led an investigator to uncover a

racial harassment/hostile work environment claim because "[n]othing in Mitchell's

EEOC complaint indicates a hostile work environment." *Id.* at 668.

　　　The Court comes to the same conclusion here. Plaintiff's Charge contains no

description of a hostile work environment at SWC whether based on race, sex, or age.

Plaintiff's allegations were specifically related to SWC's failure to promote her in

January 2014 to the position of "Quality Assurance," which Plaintiff complains was

"given to a much younger, White Employee." (FAC Ex. 1.) Similarly, Plaintiff's account

of her January 2014 suspension for having a tongue ring would not lead an investigator to

find racial or sexual harassment. (*Id.*) Hence, the Court concludes that Plaintiff did not

exhaust administrative remedies for her claims of race, sex, or age-related hostile work

environment. *See Edwards v. Creoks Mental Health Servs., Inc.*, 505 F. Supp. 2d 1080,

1092 (N.D. Okla. 2007) ("Reading plaintiff's EEOC charge liberally, the Court finds that

the investigation of her religious discrimination, retaliation, and disability discrimination

claims could not reasonably be expected to lead to a hostile work environment claim.

Nothing in plaintiff's EEOC claim, including her general intake questionnaire, lays a

factual foundation for a hostile work environment claim.").

Because Plaintiff did not exhaust administrative remedies as to her sexual harassment claims, Plaintiff may not, for example, pursue a claim that she was sexually harassed when in 2007, Paul Conrow and Lonnie Hudson on separate occasions grabbed Plaintiff from behind. In addition, Plaintiff may not pursue NMHRA and Title VII claims of sexual harassment based on allegations that she and other female employees were sprayed with water at least three times a week during her employment. Plaintiff may not pursue a hostile work environment claim related to Cody Stewart's sexually offensive behavior, Mr. Campbell's stalking behavior, or other employees' references to assertive women as "lesbians." Likewise, Plaintiff's claims of racial harassment were not exhausted because she omitted from the Charge any description of employees' use of the n-word or employees' offensive racial jokes. Thus, she may not pursue a claim of racial hostile work environment under the NMHRA or under Title VII.[6]

Consequently, the Court will dismiss without prejudice Plaintiff's first claim that she was subjected to unlawful sexual, racial, and age harassment in violation of the NMHRA (FAC ¶¶ 43–49) for failure to exhaust administrative remedies. In addition, Plaintiff's second claim that she was sexually harassed in violation of Title VII (FAC ¶¶ 50–55) will be dismissed without prejudice for failure to exhaust administrative remedies. *See Pretlow v. Garrison*, 420 F. Appx. 798, 803 n.5 (10th Cir. Mar. 22, 2011) (unpublished) (holding that "a jurisdictional dismissal, here for lack of exhaustion, is a non-merits disposition to be made without prejudice.").

---

[6] Unlike Title VII claims, § 1981 claims for racial discrimination or racially hostile work environment do not need to be administratively exhausted. *Martin v. Central States Emblems, Inc.*, 150 F. App'x 852, 857 (10th Cir. Oct. 11, 2005) (unpublished). (citing *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 274 (10th Cir. 1975), *overruled on other grounds by Ruckelshaus v. Sierra Club*, 463 U.S. 680 (1983)). Therefore, Plaintiff's seventh claim cannot be dismissed for failure to exhaust.  Since § 1981 prohibits only racial discrimination, Plaintiff's claims for sexual harassment or age harassment are not actionable under § 1981.

2.      Allegations other than January 2014 failure to promote.

SWC further argues that Plaintiff's Title VII and NMHRA claims are not for disparate treatment because the FAC characterizes both of these claims as hostile work environment claims. SWC is correct. In Plaintiff's NMHRA claim she only alleges a violation based on "sexual, racial and age harassment." (FAC ¶ 44.) Hence, the Court will dismiss Plaintiff's NMHRA claim in its entirety for failure to exhaust. SWC argues that in her second claim under Title VII she not only alleges a sexually hostile work environment, but also attempts to tie her termination to that hostile work environment. To the extent Plaintiff claims she was terminated based on her gender in violation of Title VII, the Court will dismiss that claim for failure to exhaust. *Chapman v. Carmike Cinemas*, 307 F. Appx 164, 174 (10th Cir. 2009) (affirming dismissal for failure to exhaust and concluding that even though constructive discharge claim was related to exhausted hostile work environment claim, since it was a discrete discriminatory act, plaintiff had to file an additional administrative charge to preserve it from dismissal).

SWC argues that Plaintiff for the first time alleges that she was refused a work accommodation (FAC ¶ 41 xi) in the form of a decent chair to sit in, due to her age, while younger female employees in the front office were given expensive chairs to sit in. (*Id.*) SWC maintains that Plaintiff's failure to include this allegation in her Charge, which SWC characterizes as a disparate treatment claim, warrants dismissal for failure to exhaust. To the extent that Plaintiff's language in FAC ¶ 41 xi can be interpreted as a disparate treatment claim under Title VII, either based on age or sex, that claim will be dismissed for failure to exhaust.

B.    Plaintiff fails to state a claim for breach of contract.

In her third claim, Plaintiff alleged that SWC breached Plaintiff's implied employment contract by firing her without good cause. (FAC ¶¶ 56–61.) Plaintiff further alleged that she accrued 300 hours of personal leave time for which she was never compensated. (FAC ¶ 41 xii.) Plaintiff alleged that an implied contract arose out of SWC's "policy" of terminating employees only for good cause. (FAC ¶ 12.) Plaintiff alleged that after the ninety-day probation period, she was "employed by Defendant under an oral contract of employment which was modified and re-enforced by certain policies, practices, assurances and other express and implied statements of Defendant. In said contract, it was implicitly agreed that Plaintiff would not be impeded in her job duties, and that she would be terminated only with advanced notice, opportunity to remediate deficiencies and for good cause." (FAC ¶ 57.) Plaintiff contends that she was performing her obligations under her contract, but she was fired without good cause, without notice, and without an opportunity to remediate. (FAC ¶ 58–59.)

Under New Mexico law, unless there is an explicit contract of employment stating otherwise, employment is terminable at will. *Negrete v. Maloof Distr. LLC*, 762 F. Supp. 2d 1254, 1284 (D. N.M. 2007) (citing *Sanchez v. The New Mexican,* 106 N.M. 76, 78, 738 P.2d 1321, 1323 (1987)). New Mexico recognizes two exceptions to this general rule: 1) wrongful discharge in violation of public policy, such as retaliatory discharge; and 2) an implied contract that restricts the employer's power to discharge employees at will. *Id.* (quoting *Garcia v. Middle Rio Grande Conservancy Dist.,* 1996–NMSC–029, ¶ 10, 121 N.M. 728, 918 P.2d 7, 10).

The New Mexico Supreme Court explained that "whether an implied contract exists is a question of fact, and it may be 'found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct.'" *Id.* (quoting *Garcia,* 1996–NMSC–029, ¶ 10). An implied contract is created only where an employer creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." *Gonzales v. City of Albuquerque*, 849 F. Supp. 2d 1123, 1167 (D. N.M. 2011) (citing *Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 672, 857 P.2d 776, 783 (1993)). If the employer's promise is not sufficiently explicit, no reasonable jury could find an implied contract. *Id.* (citing *Hartbarger*, *supra*).

SWC argues that Plaintiff failed to specifically allege what conduct or statements she relied on to reasonably and objectively believe she had a contract and could only be fired for cause. The Court agrees. Plaintiff failed to allege what "policies, practices, assurances, and other express and implied statements" were presented to her. She does not identify or name any employee or supervisor who made these assurances or statements to her. Although it is undisputed that SWC maintains a progressive discipline policy, the existence of this policy does not in and of itself create a reasonable expectation that SWC would fire only for cause. *See Gonzales*, 849 F. Supp. 2d at 1168–69 (finding that progressive discipline policy was insufficient, without more, to create an implied employment contract). Plaintiff's allegations simply do not plausibly state a

claim that she had an implied contract that she could be fired only for good cause. Hence, the Court will dismiss Plaintiff's third claim for breach of contract.[7]

      C.      Plaintiff states claims for retaliatory discharge.

           1.      New Mexico recognizes claims for retaliatory discharge.

In her fourth claim, Plaintiff alleges that she was discharged in retaliation for filing a workers' compensation claim, or alternatively, for complaining to authorities about workplace safety. (FAC ¶¶ 62–67.) This claim stems from New Mexico common law, which allows a wrongfully discharged employee to claim retaliatory discharge in violation of public policy. *Negrete*, 762 F. Supp. 2d at 1284.

SWC argues that the New Mexico Workers Compensation Act, NMSA 52-1-28.2(A), not New Mexico common law, provides the only remedy for workers who claim they were fired in retaliation for seeking workers compensation relief. However, the New Mexico Supreme Court has held that an employee who suffers a wrongful discharge in retaliation for filing a workers' compensation claim has a cause of action independent from the relief provided in the Workers' Compensation Act. *See* NMSA 1978, Section

---

[7] In her proposed SECOND AMENDED COMPLAINT FOR DISCRIMINATION IN EMPLOYMENT UNDER NMHRA; SEXUAL HARASSMENT UNDER TITLE VII; BREACH OF IMPLIED IN FACT CONTRACT; RETALIATORY DISCHARGE; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; NEGLIGENT SUPERVISION; VIOLATION OF 42 U.S.C. § 1981 (SAC) (Doc. No. 32) submitted with her Motion to File, Plaintiff bolsters her allegations by naming certain managerial personnel who promised her that she would only be fired with cause. Hence, the Court will dismiss this claim without prejudice.

52–1–28.2 (Repl.Pamp.1991)[8] and *Michaels v. Anglo American Auto Auctions, Inc.*, 117

N.M. 91, 93, 869 P.2d 279, 281 (1994) (holding that a claim for reinstatement and civil

penalty under Act is not exclusive).

Next, SWC argues that New Mexico requires an employee to show he was

discharged "for the sole reason that he sought workers' compensation benefits." NMSA §

52-1-28.2 (A). SWC maintains that since Plaintiff has not alleged that her workers'

compensation claim was the sole reason she was discharged, Plaintiff's claim should be

dismissed. The standard, however, applies only to the administrative remedy, not to the

common law claim. *Michaels*, 117 N.M. at 93–94, 869 P.2d at 281–82 Thus, Plaintiff

may assert a separate tort claim under New Mexico common law that she was wrongfully

discharged in retaliation for filing a workers' compensation claim. *Id.*

Alternatively, Plaintiff alleges she was discharged for reporting SWC safety

violations under the New Mexico Occupational Safety and Health Act (NM OSHA). *See*

*generally*, NMSA 1978 §§ 50-9-1–50-9-25. In similar fashion, SWC argues that Plaintiff

is limited to an administrative remedy under NM OSHA. However, New Mexico courts

recognize that an employee who is discharged for making a safety complaint has a private

---

[8] The New Mexico Workers' Compensation Act Section 52-1-28.2 provides:

> A. An employer shall not discharge, threaten to discharge or otherwise retaliate in the
> terms or conditions of employment against a worker who seeks workers' compensation
> benefits for the sole reason that that employee seeks workers' compensation benefits.
> B. Any person who discharges a worker in violation of Subsection A of this section shall
> rehire that worker pursuant to the provisions of the Workers' Compensation Act and the
> New Mexico Occupational Disease Disablement Law, provided the worker agrees to be
> rehired.
> C. The director or a workers' compensation judge shall impose a civil penalty of up to
> five thousand dollars ($5,000) for each violation of the provisions of Subsection A or B
> of this section.

cause of action for retaliatory discharge. In *Gutierrez v. Sundancer Indian Jewelry, Inc.*, the New Mexico Court of Appeals held that the administrative remedy under NM OHSA[9] did not displace the common law remedy available to an employee who is discharged in retaliation for reporting safety concerns. 117 N.M. 41, 43, 868 P.2d 1266, 1268 (Ct. App. 1994). The court reasoned that since employers have a common law duty to provide a safe workplace, and since NM OHSA merely codified and detailed the scope of that duty, the remedy provisions of NM OSHA did not supplant the common-law action for retaliatory discharge. *Id.* at 48, 868 P.2d at 1273. Thus, Plaintiff may assert a separate tort claim under New Mexico common law that she was wrongfully discharged in retaliation for reporting unsafe practices in the workplace.

2.      Plaintiff alleged a causal connection.

SWC argues that the Court should dismiss Plaintiff's claim for failure to allege a causal connection between Plaintiff's discharge from employment and her protected activity, either her workers' compensation claim or her safety complaint. *See Garrity v. Overland Sheepskin Co.*, 917 P.2d 1382, 1386 (N.M. 1996) (stating that employees must show a "causal connection between their actions and their subsequent discharge."). Even though this claim is governed by New Mexico law, courts may borrow the federal

---

[9] NMSA 1978 § 50-9-25(B) provides:

> B. Any employee who believes that he has been discharged or otherwise discriminated against by any person in violation of this section may, within thirty days after such alleged violation occurs, file a complaint with the secretary, in writing and acknowledged by the employee, alleging such discrimination. Upon receipt of the complaint, the secretary shall cause such investigation to be made as he deems appropriate. Within sixty days of the receipt of a complaint filed under this section, the secretary shall notify the complainant of his determination. If, upon such investigation, the secretary determines that the provisions of this section have been violated, he shall file a petition in the district court for the political subdivision in which the alleged violation occurred to restrain the violation of Subsection A of this section and for other appropriate relief including rehiring or reinstatement of the employee to his former position with back pay.

standard of proof from employment retaliation cases. *See Ocana v. American Furniture Co.*, 2004-NMSC-018, ¶ 35, 135 N.M. 539, 91 P.3d 58 (stating that New Mexico courts may look to federal civil rights adjudication for guidance in interpreting NMHRA claims for retaliatory discharge). To state a claim for unlawful retaliation, Plaintiff must alleged she engaged in a protected activity, here the workers' compensation claim or the safety report; SWC took adverse action against her contemporaneously or subsequent to the protected activity; and there is a causal connection between such activity and SWC's actions. *Duran v. New Mexico Dept. of Labor*, 143 F. Supp. 2d 1278, 1284 (D. N.M. 2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Plaintiff has clearly alleged the first two elements, that she engaged in protected activity and that she suffered an adverse employment action.

Courts have applied a two-fold test for showing causation in retaliation cases. First, a plaintiff either must show that there is a close temporal proximity between the protected conduct and the adverse action, or a plaintiff must allege facts supporting an inference of retaliatory motive that link the discharge from employment to plaintiff's protected conduct. Second, the plaintiff must show that the person making the employment decision knew of the protected conduct at the time the decision was made. *Duran*, 143 F. Supp. 2d at 1284 (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

SWC correctly asserts that the Tenth Circuit requires a close temporal proximity to meet the first causation requirement. *Id.* A gap of more than three months between the protected activity and the adverse employment action, standing alone, is insufficient to establish causation. *Anderson,* 181 F.3d at 1179. SWC maintains that Plaintiff cannot

meet the causal connection requirement because Plaintiff's two protected activities occurred more than 3 months and more than 8 months, respectively, before she was fired. However, a short time gap between protected activity and an adverse employment action is only one way to show a causal link between the employee's activity and employer's retaliation. For example, evidence that an employee was called a "troublemaker" or that an employee was not recommended for a position because of "vocal and demonstrative" activities may also support causation. *Dillon v. Twin Peaks Charter Academy*, 2009 WL 2982008, *3 (D. Colo. Sept. 11, 2009) (finding that the plaintiff established a jury question on causation related to retaliation claim).

Plaintiff's safety complaint, which led to a complete rewiring of the SWC plant, occurred about 8 months before she was discharged. Plaintiff alleged that after her safety complaint "[i]n 2014, Plaintiff was referred to contemptuously as a 'whistleblower' by Mr. Musick, Mr. Denton, and other supervisors." (FAC ¶ 20 vi.)[10] Plaintiff also asserts that she overheard Mr. Musick state in reference to her safety complaint, "that nigger . . . is not going to get away with this." (FAC ¶ 18.) And Plaintiff alleges that supervisors retaliated against her by calling her into the supervisor's office for petty work rule violations and by falsely accusing her of shoddy work performance or for failing to perform work that was not part of her job description.[11] Although Plaintiff's dates are inexact, given the mandate that the Court construe the FAC favorably to Plaintiff, these

---

[10] In FAC ¶ 21, Plaintiff describes a write up she received for having a tongue ring. The write up was made by two of the supervisors that allegedly called her a "whistleblower." Plaintiff alleges that the circumstances surrounding this write up were "in retaliation for Plaintiff making a work place safety complaint to the Occupational health and Safety Bureau."(FAC ¶ 21.)

[11] In 2014, Plaintiff was falsely accused of taking milk samples incorrectly and Plaintiff was falsely accused of "taking milk truck tankers with the seal broken[.]" (FAC ¶ 20 ii, iii.) Eric Denton and Justin Musick "watched Plaintiff's work performance on a daily basis thereafter." (FAC ¶ 20 iv.) In 2014, Plaintiff was "accused of not taking milk tankers into the plant in a timely fashion despite the fact that she was not responsible for this job." (FAC ¶ 20 v.)

allegations are sufficient to plausibly state a claim that Plaintiff was discharged in retaliation for making the safety complaint.[12] *See Dillon*, *supra*.

In contrast, Plaintiff was discharged only 3 months and 7 days after she filed her worker's compensation claim on March 27, 2014. If the Court considers June 20, 2014 as the effective discharge date, Plaintiff's March 27, 2014 workers' compensation claim was less than three months prior to her discharge. Plaintiff further alleges that on June 18, 2014, two days prior to Plaintiff's effective discharge date, Ms. Jackson, Ms. Abrego, and Mr. Denton signed a work release acknowledging Plaintiff's physical limitations and agreeing that SWC could accommodate Plaintiff's restrictions. (*See* FAC Ex. 3.) Nevertheless, two days later, Ms. Abrego gave Plaintiff a memo telling her to "go home since we cannot accommodate at this time." (FAC Ex. 5.) Because her physical limitations were related to her workers' compensation claim, these events support a retaliatory motive for Plaintiff's discharge. Finally, Plaintiff's allegation that it was "well known by Plaintiff and others that any African-American or Hispanic" who was injured on the job "was terminated," also support causation. (FAC ¶ 34.) Given the temporal proximity of approximately 3 months between the workers' compensation claim and her discharge and given the other allegations surrounding SWC's accommodation or lack of accommodation of her physical limitations, and Plaintiff's perception that minority workers who made workers' compensation claims were fired, the Court finds that Plaintiff has sufficiently pled a claim that she was discharged in retaliation for filing a

---

[12] SWC does not mention the second element of a retaliatory discharge claim. However, since the entire SWC plant was rewired as a result of Plaintiff's complaint, it is reasonable to infer that all employees, including those who decided to fire Plaintiff, were aware of her safety complaint.

workers' compensation claim.[13] Because Plaintiff has sufficiently alleged that her discharge was causally linked to either her workers' compensation claim or her safety complaint, the Court will not dismiss Plaintiff's fourth claim.

D.      Plaintiff's IIED Claim.

In her fifth claim, Plaintiff alleged that SWC is liable for IIED "[i]n failing to protect Plaintiff from the continuing sexual harassment and other offensive conduct of [SWC's] supervisors." (FAC ¶ 69.) Plaintiff further alleged that "[SWC] abused its special position which vested it with substantial power to control her work environment and to damage her interests and well being [sic]." (*Id.*) Plaintiff alleged that as a result of SWC's failure to protect her, Plaintiff suffered "extreme and severe mental anguish and emotional distress including loss of sleep, headaches, weight fluctuation, stress, depression, [and] worry on a daily basis[.]" (FAC ¶ 71.)

SWC argues that the Court should dismiss Plaintiff's IIED claim because it is supported by only "boilerplate" allegations without factual substance. However, by linking her allegations of sexual harassment to her IIED claim Plaintiff goes beyond mere boilerplate assertions of wrongdoing. However, the Court will not search out the FAC to determine what "other offensive conduct of [SWC's] supervisors" would support this claim because the allegation is too vague. Consequently, the Court will analyze Plaintiff's IIED claim based on her description of sexual harassment.

---

[13] In addition, Plaintiff has sufficiently alleged that the supervisors responsible for firing her had knowledge of her workers' compensation claim.

1.    Plaintiff's claim is timely.

Before addressing the substance of Plaintiff's factual allegations, however, the Court will address SWC's argument that Plaintiff's claim is barred by the three-year statute of limitations for IIED claims. *See* NMSA 1978, § 37–1–8. Under New Mexico law, the statute of limitations begins to run as soon as the plaintiff knows of the facts on which his or her claim is based. *McDow v. Gonzales*, No. CIV 07–1266 JB/WPL, 2008 WL 5979833, *14 (D. N.M. Sept. 30, 2008) (unpublished). The first acts on which Plaintiff bases her claim are the 2007 incidents in which Plaintiff was "grabbed from behind," and Plaintiff was taken off the night shift and her pay was reduced. (FAC ¶ 38 i, ii.) Next, Plaintiff alleges she was sprayed with water and witnessed other females sprayed with water on the VAT deck, which exposed their undergarments and female anatomy. No dates are given as to when this first started, but Plaintiff alleged that "[i]n 2007-08 Plaintiff complained to Brenda Miller the Human Resources Manager about the water spraying." Thus, the Court infers that the water spraying began as early as 2007. Plaintiff alleged that she was "sprayed with water by Supervisor Donnie Romero on average at least three times a week during her employment with SWC until approximately May, 2014 when he was terminated . . . Donnie Romero had power to terminate Plaintiff and/or materially change the terms and conditions of her employment and was a supervisory personnel [sic] of Defendant." (FAC ¶ 38 v.) Plaintiff further alleged that in January 2014 she was sexually harassed when she was "forced to open her mouth to expose a piercing while younger females were not required to do the same humiliating act." (FAC ¶ 21.) Plaintiff failed to allege when the other sexually offensive incidents occurred. (See FAC ¶ 38 ix-xii.)

Plaintiff's allegation that she was inappropriately "grabbed from behind" by male employees on two occasions in 2007 is time barred because these discrete incidents occurred more than three years prior to the date this suit was filed.  On the other hand, the allegation that Plaintiff and other females were sprayed with water from 2007 until May 2014 does not render Plaintiff's IIED claim untimely because the behavior continued to May 2014, within the limitations period. *See Montoya v. New Mexico Dep't. of Pub. Safety*, Civ. No. 09-1068 BB/RLP, MEMORANDUM OPINION AND ORDER (Doc. No. 27), at 4–5 (D. N.M. Mar. 30, 2010) (unpublished) (finding that IIED may be considered a continuing tort).

> 2.    Plaintiff's previous affidavit testimony does not affect the accrual of Plaintiff's IIED claim.

SWC contends that the Court should dismiss Plaintiff's IIED claim as untimely based on Plaintiff's testimony in a previous sexual harassment case against SWC, *Macias v. Southwest Cheese Co.*, No. 12-CV-350 (D. N.M. Dec. 7, 2015).  On December 6, 2015, Plaintiff testified by affidavit as follows:

> 3. I [sic] 2007 was sprayed with water by Assistant Team Leader Manual Rodriguez while on the VAT deck. This was unwelcome, and humiliating and interfered with my ability to do my job.
> 4. In 2007 I saw SWC Assistant Team Leader Jose Borjas spray water on other female employees on the VAT deck on a continuous and frequent basis in the presence of managers who would laugh. The water would wet down the females [sic] shirt so that the outline of their breasts and genitals could be seen along with the outline of their undergarments. This was humiliating and unwelcome to me.
> 5. In 2009 I saw Team Leader Donnie Romero spray females with water.

Mot. Ex. A ¶¶ 3–5, No. 12-CV-350 JAP/WPL (Doc. No. 130-3). SWC contends that Plaintiff previously testified that she was sprayed with water in 2007 by Mr. Rodriguez and that she saw Mr. Borjas and Mr. Romero spray others with water in 2007 and 2009,

but Plaintiff now alleges in the FAC that Mr. Romero sprayed her with water on a weekly basis throughout her employment and that Mr. Garcia also sprayed her with water. SWC further contends that Plaintiff's allegations in the FAC contradict her affidavit. Plaintiff alleged in her FAC that she reported the water spraying in 2007-08, and "Brenda Miller said a letter would be issued, but Plaintiff never saw the letter and the spraying continued to occur against Plaintiff and other female employees in her presence." (FAC ¶ 38 vi.) However, in her affidavit, Plaintiff testified, "I received a letter from Brenda Miller of Human Resources that the water spraying should stop. However, the water spraying continued throughout the term of my employment." (Mot. Ex. A ¶ 6.)

SWC argues that Plaintiff's allegations in the FAC are so different from her affidavit testimony in *Macias* that the Court should "reject Plaintiff's misleading attempts to avoid limitations here and dismiss her allegations regarding water spraying as barred by limitations." (Mot. at 7.) SWC essentially asks the Court to disregard Plaintiff's allegations in her FAC that she was the victim of water spraying on a continuing basis from 2007 until May 2014.

Plaintiff responds that the affidavit does not directly contradict her allegations that she was sexually harassed on a continuing basis from 2007 until 2014. Plaintiff argues that the *Macias* case focused on events that occurred between 2009 and 2011, the time period Ms. Macias was employed at SWC, and "there was no point in discussing [Plaintiff's] issues that occurred some three years after Ms. Macias left SWC." Moreover, Plaintiff contends she "consistently has stated that she complained to the Human Resources Director Brenda Miller about the water spraying; and that Miller promised that a letter would be issued; but the water spraying continued unabated." (Resp. at 4.)

Plaintiff claims that her affidavit in *Macias* is "not germane to a Motion to Dismiss which tests only the legal sufficiency of the pleading and is an improper attempt to convert the Motion into a motion for summary judgment." (Resp. at 3–4.)

In support of its argument that dismissal is appropriate, SWC cites a case in which the Tenth Circuit upheld a district court's use of court documents to determine whether a plaintiff had knowledge of a claim sufficient to trigger the statute of limitations. In *Stone v. Whitman*, 324 F. App'x 726 (10th Cir. 2009), the plaintiff was named in 2000 as a co-representative of the estate of a man who committed suicide in 1996. *Id.* at 727. As part of the 1996 death investigation, the Denver Police Department (DPD) confiscated three guns from the decedent's home along with a handwritten will naming the plaintiff as sole beneficiary to his estate. *Id.* In 2006, the plaintiff filed an action in small claims court against the City and County of Denver seeking damages because the DPD had destroyed two of the guns and had given one gun to the wrong person. *Id.* In July 2007, after the small claims case was dismissed, the plaintiff filed a § 1983 claim in federal district court alleging she was deprived of property without due process of law and without just compensation. *Id.* at 728. The defendants moved to dismiss arguing that plaintiff's claim was barred by the two year statute of limitations. *Id.* To determine when the limitations period on the plaintiff's claim began to run, the district court had to decide when the plaintiff knew or had reason to know of the existence of her injury and when the plaintiff had the right to redress that injury. *Id.* (citing *Alexander v. Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004)).

Based on the record from small claims court, the district court found that the plaintiff's injury arose in 1996 when the plaintiff became aware of the will and the

seizure of the guns. However, the district court held that the statute of limitations was tolled until May 2000, when the plaintiff was named co-representative of the decedent's estate because at that time she acquired the right to make a claim on behalf of the estate. *Id.* at 727, *see also* 2008 WL 4079293, *2 (D. Colo. Aug. 26, 2008). Since the plaintiff did not file her claim under § 1983 within two years of May 2000, her claim was time barred. *Id.* at 728, *see also* 2008 WL 4079293, *2.

On appeal, the plaintiff questioned the district court's use of the record from small claims court to determine, on a motion to dismiss, when the statute of limitations clock began to run. *Id.* The Tenth Circuit affirmed and found that the district court "did not convert the motion to dismiss to a motion for summary judgment; rather, it simply took judicial notice of records from the proceedings in small claims court." *Id.* (citing *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006) (court may take judicial notice of facts that are a matter of public record)).

Based on the holding in *Stone*, SWC argues that this Court should take judicial notice of Plaintiff's affidavit in *Macias* and find that Plaintiff's IIED claim based on sexual harassment is time barred. SWC asks the Court to rely on Plaintiff's affidavit testimony that the water spraying occurred in 2007 and in 2009, and SWC asks the Court to disregard Plaintiff's allegation in the FAC that she "was sprayed with water by Supervisor Donnie Romero on average at least three times a week during her employment with SWC until approximately May, 2014." SWC characterizes Plaintiffs' allegations of continuous harassment as "a misleading attempt to avoid limitations." (FAC ¶ 38 v.) However, SWC ignores Plaintiff's affidavit testimony in *Macias* that she "received a letter from Brenda Miller . . . that the water spraying should stop. However,

the water spraying **continued throughout the term of my employment**." (Resp. Ex. A ¶ 6) (emphasis added). SWC attacks this statement as misleading because her affidavit testimony about receiving a letter from Ms. Miller contradicts her allegation in the FAC that she "never saw the letter." (FAC ¶ 38 vi.) However, SWC's detailed arguments, that Plaintiff's FAC contradicts her prior affidavit testimony in *Macias*, ultimately involve an issue of credibility that is not appropriate to address in ruling on a motion to dismiss. Also, the Court must give deference to Plaintiff's allegation in the FAC, which is not wholly contradicted in her *Macias* affidavit. Consequently, Plaintiff has sufficiently alleged a continuing series of sexually harassing events that precludes dismissal of her IIED claim as untimely.[14]

### 3.     Plaintiff sufficiently alleged outrageous conduct.

SWC next argues that Plaintiff has failed to state an IIED claim because, as a matter of law, Plaintiff has not alleged that she was injured by extreme and outrageous conduct. To recover for intentional infliction of emotional distress, a plaintiff must show (1) the defendant's conduct was extreme and outrageous; (2) the defendant's conduct was intentional or in reckless disregard of the effects on the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the plaintiff's distress. *Trujillo v. Rio Arriba Elec. Coop.*, 2002-NMSC-004, ¶ 25, 131 N.M. 594, 41 P.3d 333. Conduct that is actionable under this tort must be so extreme in degree and so outrageous in character "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

---

[14] Plaintiff may rely on the continuous behavior even though much of the behavior occurred prior to the three year limitations period. This behavior is related by type and frequency, even if not committed by the same perpetrator. *See infra discussion part III. F. 4.*

community." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d). It is the Court's initial responsibility to determine whether, as a matter of law, the conduct is so extreme as to permit recovery for this tort. *Id.* ¶ 26.

New Mexico courts recognize that the extreme and outrageous character of the conduct "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." *Baldonado v. El Paso Nat. Gas Co.*, 2008-NMSC-005, ¶ 28, 143 N.M. 288, 294, 176 P.3d 277, 283 (citing Restatement (Second) of Torts § 46 cmt. e; and Restatement (Third) of Torts § 45 cmt. c) ("[W]hether an actor's conduct is extreme and outrageous" depends on the facts of each case, including the relationship of the parties").[15] One such relationship is the employer-employee relationship.

In *Dominguez v. Stone*, 1981-NMCA-146, ¶ 4, 97 N.M. 211, 638 P.2d 423, the New Mexico Court of Appeals reversed a summary judgment granted in favor of the defendant on an IIED claim. In that case, the plaintiff, a 22 year-old Mexican National, who legally resided in New Mexico, was employed as the director of the Senior Citizens Program in the Village of Central, New Mexico. Defendant Stone was a member of the Village's Board of Trustees. During a public meeting of the Village Trustees, Defendant Stone made statements that the person performing the duties of program director of the Village of Central Senior Citizens Program should not be a Mexican because the program

---

[15] In *Baldonado,* the defendant's gas pipeline exploded and killed twelve members of an extended family at a nearby campsite. 2008–NMSC–005, ¶ 3. The plaintiff firefighters, who were the first responders at the horrific scene involving several children in addition to adults, brought claims of intentional infliction of emotional distress against the pipeline company. The plaintiffs alleged that the defendant had failed to properly design and maintain its gas pipelines, that the defendant had been earlier cited for the failure, and that the defendant had previously experienced two explosions as a consequence of those failures. *Id.* ¶ 35. This past conduct, combined with the defendant's obligations under federal law to actively cooperate with firefighters, led the New Mexico Supreme Court to conclude that the defendant's conduct was reckless, extreme, and outrageous. *Id.* ¶¶ 22, 33, 36.

was funded with American tax dollars. *Id.* At the public meeting, Defendant Stone also interrogated the plaintiff about whether she paid income and property taxes, whether she possessed a green card, whether she applied for United States citizenship, and whether she had registered to vote in the United States. *Id.* The court found that the evidence of this public humiliation was sufficient to send the IIED claim to the jury. *Id.* ¶ 18. The court noted that if reasonable minds can differ about whether a defendant's conduct is extreme and outrageous, the issue must be sent to the jury. *Trujillo*, 2002 -NMSC- 004, ¶ 26.

In *Riske v. King Soopers*, 366 F.3d 1083, 1089 (10th Cir. 2004), the plaintiff's work supervisor anonymously sent her gifts and increasingly disturbing notes on at least 10 occasions over a two year period, "stalked her" around the workplace, and whistled at her despite at least 10 requests by plaintiff that he stop. *Id.* Applying Colorado law, the court found, "[a]lthough this case presents a close question, we conclude that the conduct here comes so close to the bounds of decency that reasonable people could disagree about whether it constitutes actionable conduct, sufficient to state a claim for outrageous conduct." *Id.*[16] In *Nieto v. Kapoor*, a court applying New Mexico law denied summary judgment to the defendant on plaintiff's IIED claim based on evidence that the supervisor routinely made disparaging and offensive remarks about minorities and women,

---

[16] The court in *Riske* cited several Colorado cases including *Mass v. Martin Marietta Corp.*, 805 F. Supp. 1530, 1543–44 (D. Colo. 1992) (finding that co-workers' racial jokes, egregious racial terms, and other racially derogatory written items were "an intentional pattern of harassment" on which a reasonable jury could find liability for outrageous conduct); *Gwin v. Chesrown Chevrolet,Inc.*, 931 P.2d 466, 469 (Colo.App.1996) (ruling that jury's finding of liability for outrageous conduct was supported by evidence that manager used racial slurs, shouted expletives at plaintiff, and fired him); *Spulak v. K Mart Corp.*, 664 F. Supp. 1395, 1397 (D. Colo. 1985) (pattern of conduct involving false accusations sufficiently stated a claim for outrageous conduct). Although Colorado case law has no precedential authority in this case, New Mexico and Colorado both follow the Restatement (Second) of Torts and have the same legal requirements for IIED claims.

repeatedly used offensive and inappropriate language regarding race and gender in public, made physical contact with employees by pushing or pulling them into patient's rooms, and interfered with their employment duties. *Nieto v. Kapoor*, 61 F. Supp. 2d 1177, 1184–85 (D. N.M. 1999).

Plaintiff alleges that she was sprayed with water at least three times per week during her employment. The water spraying was physically invasive and severely humiliating because it exposed undergarments and the female anatomy. The Court concludes that a reasonable juror could find that this conduct goes beyond the bounds of decency and that it constitutes outrageous conduct.

4.      Plaintiff alleged severe emotional distress.

SWC maintains that even if Plaintiff sufficiently alleged outrageous conduct, Plaintiff failed to plausibly allege she suffered "extreme" emotional distress as a result. SWC contends that Plaintiff's allegations that she suffered, "loss of sleep, headaches, weight fluctuation, stress, depression, [and] worry on a daily basis" are insufficient as a matter of law to state a claim for IIED. (FAC ¶ 71.)

New Mexico law defines "severe emotional distress" as distress so debilitating that "a reasonable person, normally constituted, would be unable to cope" with it. *Trujillo*, 2002 -NMSC- 004, ¶ 28. *Trujillo* involved allegations that the defendant's decision to fire the plaintiff for unsatisfactory job performance caused the plaintiff to feel lousy and depressed, take Prozac, sleep long hours, and eat erratically. *Id.* The New Mexico Supreme Court concluded that plaintiff's emotional distress was not severe enough to permit recovery under the law. *Id.* However, in *Dominguez,* the New Mexico Court of Appeals recognized that severe emotional distress can include "fright, horror,

38

. . . shame, humiliation, embarrassment, [and] worry." 1981-NMCA-146, ¶ 16 (quoting Restatement (Second) of Torts § 46 (1965)). Moreover, the *Dominguez* court noted that the longer a person endures fear and worry, "the more likely it is to constitute severe distress." *Id.* (noting that duration is a critical factor in determining whether distress is severe enough to warrant recovery).

Here, Plaintiff alleged that she was hosed down with water on average three times per week during seven years of her employment. Plaintiff alleged she was continuously afraid to go onto the VAT deck for fear of being hosed down. The New Mexico Court of Appeals has explained that this type of evidence – objective information about the circumstances creating the distress – may corroborate a plaintiff's claims of severe emotional distress. *Id.* ("[I]n many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed."). At this juncture, the Court finds that Plaintiff has sufficiently alleged she experienced severe emotional distress caused by a daily fear and anxiety over a lengthy period of time.

### 5.  SWC's liability for IIED.

SWC also questions its vicarious liability for Plaintiff's IIED claim. Under basic respondeat superior principles, an employer is liable for an employee's torts committed within the scope of the employee's employment. *Ocana*, 2004-NMSC-018, ¶ 29. However, an employer is not liable for an employee's intentional torts, like IIED, because an employee who intentionally injures another individual is generally considered to be acting outside the scope of the employee's employment. *Id.* Consequently, intentional torts arising from sexual harassment are considered to be outside the scope of employment. *Id.*  However, when severe sexual harassment or other intentional torts are

committed by supervisory or management personnel, or witnessed by those personnel, and the employer fails to stop the conduct, that employer may be held liable on a claim for IIED. *Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 48, 127 N.M. 47, 976 P.2d 999.

In *Coates*, the New Mexico Supreme Court upheld a jury verdict in favor of two plaintiffs who alleged that their supervisor sexually harassed them over a period of several months, they repeatedly complained to other supervisors about the behavior, and store management did nothing to stop the behavior. 1999-NMSC-013, ¶ 48, 127 N.M. 47, 976 P.2d 999. In rejecting Wal-Mart's argument that it should not be liable for IIED based on the actions of one employee, the court determined that the actions of the harassing supervisory employee, coupled with the conduct of several managers in failing to protect the plaintiffs from the harassment, caused the plaintiffs' severe emotional distress. *Id.* The court concluded that the supervisor's conduct was outrageous and that Wal-Mart intentionally allowed the harassment to continue with 'utter indifference to the consequences.'" *Id.* (citations omitted). Because several Team Leaders and other SWC management personnel participated in or witnessed the water spraying and did not stop it, SWC may be held liable for failing to protect Plaintiff from such behavior.

E.     Plaintiff's Claim for Negligent Supervision.

In her sixth claim, Plaintiff alleged that SWC knew or should have known that "Donnie Romero and others were engaging in the unlawful behavior described herein above. Donnie Romero was a sexual predator who sprayed Plaintiff and other female employees [sic] shirts with water and engaged in other sexual harassment with the knowledge of management. . . . Romero was re-hired by SWC despite the 'reservations'

of its own Human Resources Manager." (FAC ¶ 74–75.) Plaintiff further alleged that

"Cody Stewart had a well known [sic] habit of exposing his genitals that was known to

management as early as 2007." Finally, Plaintiff alleged that SWC had actual and

constructive notice of its supervisors [sic] failure to adhere to its own policies regarding

sexual harassment because among other things its internal e-mail system was used to

send sexually offensive and inappropriate pictures/videos." (FAC ¶ 75.) Plaintiff claims

that SWC knew or should have known that this behavior would cause Plaintiff's

emotional distress including "anxiety, tension, and humiliation," and SWC knew the

conduct would continue without the intervention of management personnel. (FAC ¶ 76–

77.) Plaintiff alleges that SWC's negligent failure to "prevent, supervise, prohibit,

control, regulate, discipline, and/or otherwise penalize" the employees who engaged in

offensive conduct had the effect of "encouraging, ratifying, condoning, exacerbating,

increasing and worsening" the offensive conduct. (FAC ¶ 78–79.) Plaintiff asserts that

"[a]s a direct and proximate result of Defendant's actions, Plaintiff has suffered and will

continue to suffer severe mental anguish and emotional distress[.]" (FAC ¶ 83.)

　　　To establish the claim of negligence in supervising an employee, the plaintiff has

the burden of proving that (1) plaintiff's employer knew or should have known that

failure to supervise a certain employee would create an unreasonable risk of injury to

other employees; (2) the employer failed to use ordinary care in supervising the

employee; and (3) the employer's negligence in supervising an employee caused the

plaintiff's injury. NMRA, Civ. UJI 13-1647.  In other words, an employer may be liable

if "the employer becomes aware or should have become aware of problems with an

employee that indicated his [or her] unfitness, and the employer fails to take further

action such as investigating, discharge or reassignment." *Spencer v. Health Force, Inc.*, 2005–NMSC–002, ¶ 22, 137 N.M. 64, 107 P.3d 504 (internal quotation marks and citation omitted).

SWC argues that Plaintiff's claim for negligent supervision is defective as to two of the three types of behavior that support Plaintiff's claim—Cody Stewart's behavior and the offensive emails. First, SWC maintains that Plaintiff alleged no facts suggesting that Plaintiff knew about or was harmed by Cody Stewart's conduct of exposing himself. The Court agrees. Even though Plaintiff alleged that "Cody Stewart had a well known [sic] habit of exposing his genitals that was known to management as early as 2007[,]" Plaintiff failed to plead that she knew about his behavior and that she was injured thereby. (FAC ¶ 75.) Likewise, Plaintiff failed to allege that she was exposed to and injured by the offensive e-mails. Moreover, Plaintiff failed to allege that SWC's tolerance of this behavior contributed to the behavior that injured her, i.e. the water spraying. Thus, the Court will dismiss Plaintiff's negligent supervision claim, as it pertains to Cody Stewart's conduct and as to the offensive e-mails. However, the Court will not dismiss this claim as it relates to the water spraying incidents because Plaintiff has sufficiently alleged that SWC knew or had reason to know about the behavior, SWC negligently failed to stop it, and the behavior harmed Plaintiff. *Spencer*, *supra*.

F.      Plaintiff's Seventh Claim for Race Discrimination.

In her seventh claim, Plaintiff alleges that SWC intentionally discriminated

against her on the basis of race in violation of 42 U.S.C. § 1981.[17]

> 1.  Plaintiff stated a disparate treatment claim.

Plaintiff specifically asserted the following in her § 1981 claim:

> Defendant intentionally discriminated against Plaintiff on the basis of race in the performance of her contract including failing to promote her, and tolerating a racially hostile work environment, and terminating her contract and in the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship with Defendant.

(FAC ¶ 88.)

SWC asks the Court to limit Plaintiff's § 1981 claim to only three theories based on its interpretation of the quoted language in FAC ¶ 88: (1) a failure to promote theory; 2) a racial hostile work environment theory; and 3) a wrongful discharge theory. Stated differently, SWC asks the Court to dismiss Plaintiff's § 1981 disparate treatment claim because that claim was stated in the last clause of paragraph 88 without factual elaboration except through "rote incorporation of all previous paragraphs." (FAC ¶ 84.) SWC cites *Green v. JP Morgan Chase Bank, N.A.*, 501 F. App'x 727, 733 (10th Cir. 2012).

In *Green*, the Tenth Circuit affirmed a district court's dismissal of a § 1981 claim for constructive discharge because the plaintiff failed to specifically assert that claim in the body of her § 1981 claim. Although the plaintiff only asserted that he was unfairly disciplined, he included language that the § 1981 claim incorporated all preceding

---

[17] Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (a).

paragraphs of the complaint. One of the incorporated paragraphs stated that plaintiff "was constructively discharged in March, 2007 when Defendant refused to investigate his claims of discrimination." On appeal, the Tenth Circuit upheld the dismissal and rejected plaintiff's argument that he pled a constructive discharge claim under § 1981. *Id.* The Tenth Circuit held, "the rote incorporation of all previous paragraphs does not overcome the plain language of the § 1981 claim itself." *Id.* In addition, the Tenth Circuit noted that in contrast, the other counts in the complaint had specifically alleged constructive discharge in violation of Title VII and Oklahoma's Anti–Discrimination Act. *Id.*

SWC argues that Plaintiff specifically listed SWC's discharge of her employment, SWC's failure to promote her, and SWC's racially hostile work environment in the body of her § 1981 claim. Hence, Plaintiff should not be able to submit an additional claim that SWC generally treated her in a disparate manner due to her race even though Plaintiff incorporated all previous paragraphs in her § 1981 claim. (FAC ¶ 84.)

In response, Plaintiff asserts that in addition to the three claims SWC argues Plaintiff is asserting, her FAC also sufficiently alleges that specific benefits, privileges, and terms and conditions of employment were disparately administered on the basis of race. (FAC ¶ 88.) Plaintiff points to her incorporated allegations from previous paragraphs that SWC disciplined African-Americans more severely and that SWC suspended or terminated African-Americans for "talking back" when similarly situated white employees were not. (Resp. at 13) (citing FAC ¶¶ 39, 40 i-x.) In addition, Plaintiff alleged that she was ignored for other job promotions, SWC accommodated white employees with physical restrictions with front office jobs but did not equally accommodate Plaintiff, and African-American and Hispanic employees who were injured

on the job were terminated while white employees were not. (Resp. 15) (citing FAC ¶¶ 33, 34, 41 i-v.) Plaintiff alleged that several named white females on the floor wore tongue rings but were not disciplined or harassed like Plaintiff. (FAC ¶ 21.)[18] *Deal*, No. 09–CV–0402–CVE–TLW, 2009 WL 3673090, * 2 (N.D. Okla. Nov. 2, 2009) (unreported) (finding allegations that the African–American sales clerks treated her politely, while the Caucasian security guard assaulted, accused and embarrassed" her were sufficient to state a claim of disparate treatment under § 1981).

Although not a model of clarity, the Court must favorably interpret Plaintiff's language in FAC ¶ 88. And the paragraph plausibly states, "Defendant intentionally discriminated against Plaintiff . . . in the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship with Defendant." (FAC ¶ 88.) Moreover, the failure to promote Plaintiff is but one form of disparate treatment, which SWC admits Plaintiff clearly alleged in FAC ¶ 88, and Plaintiff's claim could be interpreted as an expansion of the disparate treatment claim for failure to promote. Hence the Court finds that Plaintiff has stated a claim under § 1981 for disparate treatment based on the general allegations incorporated into her § 1981 claim. *Deal, supra.*

2.       Plaintiff stated a wrongful discharge claim.

SWC contends that Plaintiff failed to allege facts to support a prima facie case of wrongful termination of employment under the framework set forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973). However, in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002), the United States Supreme Court held that an employment discrimination complaint need not include specific facts establishing a prima facie case of

---

[18] Plaintiff alleged that the water hosing incidents support her § 1981 claim; however, Plaintiff fails to show how those events had a racial motive.

discrimination. *Id.* Instead a complaint must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 508. (quoting Fed. R. Civ. P. 8(a)(2)). The Supreme Court reasoned that (1) the *McDonnell Douglas* framework is an evidentiary standard, not a pleading requirement; and (2) imposing a heightened pleading standard in employment discrimination cases conflicts with Rule 8(a)(2). *Id.* Hence, "the critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'" *Adamson v. Multi Community Diversified Servs. Inc.,* 514 F.3d 1136, 1151 (10th Cir. 2008) (quoting *Plotke v. White,* 405 F.3d 1092, 1100 (10th Cir. 2005)). Plaintiff generally alleges that she was both qualified and satisfactorily performing her job duties and that despite her qualifications, she "was fired." (FAC ¶ 89.) Given the factual allegations of racial animus outlined in the FAC,[19] the Court finds that Plaintiff has adequately pled facts supporting an inference that she was discharged in violation of § 1981. *Compare Hunt v. Central Consolidated Sch. Dist.*, 951 F. Supp. 2d 1136, 1212 (D. N.M. 2013) (finding that allegations that 80% of demoted employees were Mormon and one member of school board participated in a "hate-speech blog" against Mormons were sufficient to state a claim that a school district discriminated against them because they were Mormon) *with Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012) (finding that the plaintiff failed to allege discrimination and retaliation claims because she provided no dates of occurrences or names of persons who were involved in her mistreatment).

---

[19] Plaintiff points to comments made by a Manager, Mr. Musick in Plaintiff's presence. Referring to Plaintiff, Mr. Musick said "that nigger" would not "get away" with making a safety report. He also made an offensive racial joke. (FAC ¶¶ 18, 40 vi.) Supervisory personnel at SWC used the n-word frequently according to the FAC. (FAC ¶ 40.)

SWC also argues that Plaintiff failed to allege that the reason for her termination—job abandonment—had anything to do with her race. (*Id.*) SWC correctly notes that Plaintiff must allege race-based animus to state a claim under § 1981. *Deal*, 2009 WL 3673090, * 2. But this argument assumes that Plaintiff must show pretext at the pleading stage. Allegations that an employee was fired for reasons that similarly situated non-black employees were not terminated has been held sufficient to state a claim under § 1981. *Dixon v. Board of Comm'rs of County of Oklahoma*, No. Civ. 15-196-R, 2016 WL 447724, *1 (W.D. Okla. Feb. 4, 2016) (slip. op.). Plaintiff has sufficiently alleged a wrongful termination claim under § 1981.

### 3.      Plaintiff stated a failure to promote claim.

SWC next asserts that Plaintiff failed to sufficiently plead that she was qualified for the Quality Assurance position and that she was denied the position due to her race. At the pleading stage, a plaintiff must allege that he or she was qualified for a position, but was denied it under circumstances that raise an inference of racial bias. *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). SWC argues that Plaintiff made only "naked assertions" devoid of factual support for her claim. Plaintiff alleged that in 2014, she "applied for a quality assurance job. A white male was given the job despite the fact that he had never worked in a cheese plant and was not as qualified as Plaintiff. Plaintiff was denied the promotion because of her status as a female African-American and her age." (FAC ¶ 22.) These allegations sufficiently state that the position was given to a person less qualified than Plaintiff. *See Ambus v. Autozoners, LLC*, 938 F. Supp. 2d 1225, 1235 (M.D. Ala. 2013) (denying motion to dismiss based on allegations that plaintiff had more recent experience than employees who were promoted, "[a]t this

point in the proceedings, however, the duties of the job have not been established with evidence, so that Ambus's allegation that he had more recent experience is sufficient."); *and Vinson v. Koch Foods of Ala.,LLC*, No. 2:12–cv–1088–MEF, 2013 WL 5441969, *5 (M.D. Ala. Sept. 27, 2013) (unpublished) (finding sufficient allegations that plaintiff with HR experience was not promoted and white male without HR experience was promoted). Thus, Plaintiff has stated a claim under § 1981 for failure to promote.

4.       Statute of limitations.

SWC argues that the Court should find one of Plaintiff's allegations is facially time barred under the four year statute of limitations applicable to § 1981 claims. *See Jones v. R.R. Donnelley &* Sons, 541 U.S. 369, 382 (2004) (applying federal four year statute of limitations to § 1981 claims); *and Olivo v. Crawford Chevrolet, Inc.*, 2011 WL 12687969, *5 (D. N.M. Apr. 20, 2011) (limiting discovery of employment records to four years in § 1981 case). Plaintiff alleged in 2009 "Tim Rogers (a white male SWC employee), called [truck] drivers the n-word. A meeting was held between the plant President George Chappell and the trucking company. Chappell refused to fire Rogers. Chappell walked into the lab and shook Rogers [sic] hand. Rogers was then given a job in the front office as a reward for his improper behavior." (FAC ¶ 40 vii.) SWC asks the Court to dismiss Plaintiff's §1981 claim as it relates to this behavior because it is not related by type or frequency, and it did not involve the perpetrator of the alleged slurs directed at Plaintiff in 2013 and 2014. *See Duncan v. Manager*, 397 F.3d 1300, 1309 (10th Cir. 2005) (citing *Morgan*, 536 U.S. at 117) (explaining that conduct "related by type, frequency, and perpetrator" define the scope of "related acts" that constitute[] [a] hostile work environment).

48

In *Duncan*, the plaintiff alleged a hostile work environment that spanned the entire tenure of her employment—over eighteen years. The court determined that only acts that were part of the same hostile work environment were actionable. The court limited the plaintiff's claim by "examining the acts in the filing period and determining what acts outside of the filing period are related by type, frequency, and perpetrator." *Id.* at 1309. *See also Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1153 (10th Cir. 2008) (applying *Duncan* standard to § 1981 claim).

SWC maintains that Mr. Rogers is not mentioned elsewhere in the FAC as a person who subjected Plaintiff to racial harassment, and at least four years separate his behavior from the racial slurs Plaintiff experienced in 2013-14. However, the Court concludes that a jury could rationally find that the 2009 incident involving Mr. Rogers, which occurred before the four-year limitations period, was part of the same racially hostile environment. Although the incident involved a different perpetrator, the incident involved the same offensive racial slur and a tolerance of the slur by upper management. Hence, the allegation involving this incident is not time barred.

G.     Plaintiff's Eighth Claim for Age Discrimination.

In her eighth claim, Plaintiff brings a claim under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1). (FAC ¶¶ 93–97.) SWC asks the Court to dismiss Plaintiff's ADEA claim in its entirety. SWC first points to Plaintiff's Charge and argues that Plaintiff exhausted her administrative remedies only as to two specific allegations: (1) the January 2014 failure to promote to the position of Quality Assurance and the position was given to a much younger, White employee; and (2) the January 2014

disciplinary suspension. (FAC Ex. 1.) [20] The Court agrees and has stated so above.

Plaintiff may assert ADEA claims based only on these two events.

> 1.   Plaintiff stated an ADEA claim based on failure to promote.

SWC asks the Court to dismiss Plaintiff's ADEA claim for failure to promote

under Rule 12(b)(6). SWC maintains that despite the language used in her Charge,

Plaintiff failed to state in both her FAC and in her Charge that the white male who was

given the job was under the age of forty, as required to state a prima facie ADEA claim.

(Mot. at 11.) To state a claim for age discrimination under the ADEA, a plaintiff must

allege she is over forty, she is qualified for the position in question, she suffered from an

adverse employment decision, and her replacement was sufficiently younger to permit a

reasonable inference of age discrimination. *Hill v. Borough of Kutztown*, 455 F.3d 225,

247 (3d Cir. 2006) (citation omitted). The successful candidate need not be younger than

forty, but must be "'sufficiently younger' to permit an inference of age discrimination."

*Barber v. CSX Distrib. Servs.* 68 F.3d 694, 699 (3d Cir. 1995) (citing *Maxfield v. Sinclair*

*Int'l*, 766 F.2d 788, 792 (3d Cir. 1985)) (holding that the successful candidate, who was

over age forty and eight years younger than the plaintiff, was "sufficiently younger" than

the plaintiff for purposes of a prima facie case of age discrimination). The Court will not

dismiss the failure to promote claim because the Charge and the FAC adequately put

SWC on notice that Plaintiff is claiming she was passed over for promotion based on her

age, and at the pleading stage, this is sufficient. *Miller v. Carolinas Healthcare Sys.*, 561

F. App'x 239, 240–41 (4th Cir. 2014) (reversing dismissal of age discrimination/failure

---

[20] In her Charge, Plaintiff generally alleged that these two events were discriminatory because they were based on her age, race and sex. (FAC Ex. 1.)

to promote claim because district court required heightened factual allegations of prima facie case).

> 2.  Plaintiff failed to exhaust her ADEA claim based on January 2014 suspension.

Although her Charge describes the January 2014 suspension, Plaintiff states only that she "does not believe the suspension was legitimate and I believe this was done due to my Race (Black)." (FAC Ex. 1.) Despite making a general statement in the next paragraph that she had been discriminated due to her race, sex, and age, nothing in the Charge links the January 2014 suspension with age discrimination. Therefore, the Court agrees with SWC and will dismiss without prejudice the ADEA claim based on that event for failure to exhaust administrative remedies.

> 3.  Plaintiff failed to exhaust additional age discriminatory events described in her FAC.

In the FAC, Plaintiff alleges several events not mentioned in her Charge to support her claim that she was discriminated against due to her age. Those allegations are about events that occurred in 2013: (1) Plaintiff was passed over for a promotion to Team Leader in favor of a 22 year old female who had been on the job only three weeks; (2) Plaintiff was passed over for a position as an Assistant Quality Assurance in favor of a 26-27 year old female who was less qualified; and (3) a position as Assistant Team Leader opened up but the job was closed to Plaintiff when she indicated interest in the job. (FAC ¶ 41.) Plaintiff included another undated allegation that she was not paid for 300 hours of accrued leave. (*See* FAC ¶ 41 v-xii.) None of these incidents were described in Plaintiff's Charge.

SWC correctly maintains that ADEA claims based on these events were not exhausted because they were not included in Plaintiff's Charge, and they would not have surfaced in an investigation related to the Charge. Not only were those events omitted from the Charge and thereby unexhausted, the events in 2013 may have occurred more than 300 days prior to the date Plaintiff filed her Charge. Hence, the claims related to the 2013 events are not exhausted and may be time barred.

Plaintiff counters that she may assert her age discrimination claim based on facts in the Charge but also on all facts that would surface in an administrative investigation of those facts. *Cf. MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (finding that plaintiff did not exhaust ADA claim based on depression because she listed only coronary disease as condition in her Charge). On that basis, Plaintiff contends she has may pursue a disparate impact claim under the ADEA, which does not require a showing of intentional discrimination. Plaintiff claims she has sufficiently alleged facts in the thirteen sub-paragraphs in FAC ¶ 41 illustrating that "SWC had a policy and practice of hiring much younger less experienced workers instead of Plaintiff who was over 40 and more experienced. [¶41 i-xiii]." (Resp. at 11.)

Plaintiff avers that she exhausted a claim of disparate impact because in the Intake Questionnaire she filled out prior to submitting her Charge, she described three younger workers who were "treated more favorably than Plaintiff to wit: a 34 year old Hispanic female who had a right arm injury who was never told to shake samples. A 25 year old white female who was allowed to wear earrings and have a tongue ring, and a 39 year old male who was never visually observed when testing samples." (Resp. at 11.) At the end of her argument, Plaintiff states that she set forth

> sufficient information to establish a hostile work environment; disparate
> impact/treatment cause of action under ADEA. Defendant had a policy
> and practice of hiring less qualified workers under 40 for jobs that Plaintiff
> was much more qualified for at SWC. [41-i-xiii]. Plaintiff has established
> a prima facie case of discrimination under the ADEA and the Motion to
> Dismiss should be denied.

(Resp. at 12.)

Plaintiff correctly asserts that claims are exhausted to the extent they are described in a charge of discrimination and to the extent additional closely related circumstances are uncovered during an investigation of the charge of discrimination. However, Plaintiff incorrectly assumes that she has exhausted her disparate impact claim by including a description of three favored younger employees in her Intake Questionnaire. First, an investigator would not have uncovered her allegations of disparate impact based on the one failure to promote incident and the one disciplinary suspension outlined in her Charge, both of which occurred in January 2014. And although an Intake Questionnaire may have been allowed to support exhaustion if Plaintiff had failed to file a formal charge, once Plaintiff submitted her Charge, that document was controlling for exhaustion purposes. *See Green*, 501 Fed. App'x at 731 (holding that an employee who files a formal charge of discrimination may not rely on claims described only in pre-charge documents). "It would defeat the statutory scheme to find exhaustion where an employee includes a claim in the intake questionnaire, but then omits it in a timely subsequent formal charge that forms the basis for the administrative proceedings." *Id.* (citing *Barzanty v. Verizon Pa., Inc.*, 361 F. App'x 411, 415 (3d Cir. 2010)). Therefore, Plaintiff may not assert a claim of disparate impact under Title VII based on circumstances described in her Intake Questionnaire but not described in her Charge.

The Court finds that Plaintiff administratively exhausted her claim that she was passed over for the Quality Assurance job because of her age. As for the other allegation

that she was disciplined unfairly due to her age, Plaintiff failed to exhaust that claim because she failed to link that allegation to age discrimination. Finally, Plaintiff's allegations of age disparate treatment or disparate impact discrimination outlined in her FAC, but not included in her Charge, were not exhausted.

H.     Motion to Strike

SWC contends that the Court should strike paragraph 38 viii from the FAC as immaterial and scandalous. In that paragraph, Plaintiff alleges that a production manager named Ricardo Rivas, "carried on a sexual relationship with a female employee he supervised while he was married to another women [sic]." (FAC ¶ 38 viii.) No other allegations are made concerning Mr. Rivas, and Plaintiff makes no plausible claim that would be related to this allegation.

A court has considerable discretion in striking any redundant, immaterial, impertinent or scandalous matter. It is clear that the allegation in ¶ 38 viii has no bearing on the claims brought here, and the Court will grant the motion to strike this paragraph as immaterial and scandalous. *Lane v. Page*, 272 F.R.D. 581, 601 (D. N.M. 2011).

IT IS ORDERED that the DEFENDANT'S SECOND MOTION TO DISMISS AND TO STRIKE (Doc. No. 19) is granted in part and denied in part as follows:

1.     Plaintiff's First Claim for sexual, racial, and age harassment under the NMHRA is dismissed without prejudice for failure to exhaust administrative remedies.

2.     Plaintiff's Second Claim for sexual harassment under Title VII is dismissed without prejudice for failure to exhaust administrative remedies.

3.     Plaintiff's Third Claim for breach of contract is dismissed without prejudice.

4.      Plaintiff's Fourth Claim for retaliatory discharge based on either the workers' compensation claim or the NM OSHA complaint is not dismissed.

5.      Plaintiff's Fifth Claim alleging Intentional Infliction of Emotional Distress is not dismissed.

6.      Plaintiff's Sixth Claim for Negligent Supervision is dismissed to the extent it is based on the behavior of Cody Stewart and inappropriate internal emails. Plaintiff's Sixth Claim for Negligent Supervision is not dismissed as to the water spraying behavior.

7.      Plaintiff's Seventh Claim for violations of 42 U.S.C. § 1981 is not dismissed.

8.      Plaintiff's Eighth Claim for age discrimination under the ADEA is dismissed without prejudice for failure to exhaust administrative remedies except to the extent Plaintiff alleges a claim of age discrimination related to the January 2014 failure to promote, and that claim is not dismissed.

9.      Defendant's Motion is granted as to the request to strike paragraph 38 viii from the FAC, and that paragraph is stricken.

10.      DEFENDANT'S SECOND MOTION TO DISMISS AND TO STRIKE (Doc. No. 19) is otherwise denied.

_____
SENIOR UNITED STATES DISTRICT JUDGE