# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

MARILYN HARTWELL,

        Plaintiff,

v.                                   No. CIV 15-1103 JAP/GJF

SOUTHWEST CHEESE COMPANY, L.L.C.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

On November 1, 2016, Southwest Cheese Company, LLC (SWC) filed DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT (Motion) (Doc. No. 54). On December 14, 2016, Plaintiff Marilyn Hartwell filed an AMENDED RESPONSE TO AND MEMORANDUM IN OPPOSITION (Response) (Doc. No. 63).[1] On December 29, 2016, SWC filed DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (Reply) (Doc. No. 64).[2] After careful consideration of the pertinent law, briefing, and exhibits, the Court will grant in part and deny in part SWC's Motion, with the result that Plaintiff's 42 U.S.C. § 1981 Race-Based Hostile Work Environment Claim (Count J) will proceed to a trial. All other claims will be dismissed.

---

[1] The Court required Plaintiff to re-file her response, Doc. No. 59, because it exceeded the page limit extension allowed and because a significant portion of the response contained impermissible single spacing. Doc. No. 62. However, Plaintiff did not have to re-file her exhibits, Doc. Nos. 60 and 61, which the Court reviewed.

[2] On December 29, 2016, SWC filed DEFENDANT'S MOTION TO STRIKE SUMMARY JUDGMENT EVIDENCE (Doc. No. 66), to which Plaintiff filed a response, PLAINTIFF'S RESPONSE TO "DEFENDANT'S MOTION TO STRIKE SUMMARY JUDGMENT EVIDENCE" [Doc. 66] (Doc. No. 68). On January 16, 2017, SWC filed a REPLY IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE. (Doc. No. 69). The Court will deny the Motion to Strike as moot. *See* discussion *infra*.

## Background and Summary of Claims

SWC operates a plant that processes cheese and dairy products in Clovis, New Mexico. Plaintiff is a 60-year-old African-American woman, who SWC hired in 2006 as a Level I Cheese Operator. In 2010, Plaintiff was promoted to the Milk Intake Lab. During her approximately eight-year employment at SWC, Plaintiff was disciplined for a variety of reasons, none of which resulted in the termination of Plaintiff's employment.

In October 2013, Plaintiff was injured at work when a door hit her right shoulder. The injury led to a worker's compensation claim, as well as to restrictions in her ability to perform certain job functions. Although SWC modified some of Plaintiff's job responsibilities in June 2014, Plaintiff continued to complain of pain. Debbie Abrego, SWC's Environmental, Health and Safety Director, determined that SWC had no available jobs Plaintiff could perform at that time. After allegedly attempting without success to reach Plaintiff at home in early July 2014, Leah Jackson, SWC's Human Resources Director, concluded that Plaintiff had abandoned her job. In a letter, dated July 3, 2014, Ms. Jackson informed Plaintiff that SWC was terminating her employment, effective immediately, based on job abandonment. Plaintiff disagreed that she had abandoned her job.

In December 2015, Plaintiff sued SWC, alleging both federal and state law violations. Doc. No. 1. The Court granted in part and denied in part SWC's Second Motion to Dismiss and allowed Plaintiff to file a Second Amended Complaint (SAC), Doc. Nos. 43, 44.[3] The following claims remain: (1) age discrimination under the ADEA, 29 U.S.C. § 623; (2) 42 U.S.C. § 1981 race discrimination and race-based hostile work environment; (3) breach of implied employment

---

[3] The Court dismissed the following claims: sexual, racial, and age harassment under the New Mexico Human Rights Act, Title VII sexual harassment, negligent supervision as it applied to the behavior of Cody Stewart, and unexhausted portions of the ADEA age discrimination claim. May 24, 2016 Memorandum Opinion and Order (Doc. No. 43). Although the Court also dismissed, without prejudice, the implied employment contract claim, Plaintiff bolstered that claim in her SAC. *Id.* at 23 n.7.

contract; (4) retaliatory discharge; (5)  intentional infliction of emotional distress; and (6) negligent supervision. SAC, Doc. No. 45.

SWC asks the Court to grant it summary judgment on each of the claims and to dismiss Plaintiff's SAC with prejudice. Plaintiff argues that genuine disputes of material fact preclude summary judgment as to all of the claims.

## Summary Judgment Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002).

**Analysis**[4]

I.    <u>ADEA Claim</u> (Count K)

    A.    *Pertinent Legal Standard*

The ADEA prohibits employers from discriminating against individuals with respect to the terms of their employment on the basis of their age. *See, e.g.*, 29 U.S.C. § 623(a)(1) ("It shall be unlawful for an employer—to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."). To prove ADEA age discrimination Plaintiff must supply evidence that 1) she is over 40 years old, and, therefore a member of the class protected by the ADEA; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) her replacement or the person who received the pertinent position was sufficiently younger to permit a reasonable inference of age discrimination. *See Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1279 (10th Cir. 2010); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 699 (3d Cir. 1995).

    B.    *Discussion*

Plaintiff alleges that she was denied a number of positions and promotions based on age and/or race[5] discrimination. However, Plaintiff did not submit applications specific to most of the positions she believes she should have received. Instead, Plaintiff contends that she filled out an application form when she was hired, that SWC kept that application on file, and that each time a position opened at SWC, Human Resources checked the employee applications it kept on

---

[4] Rather than set out Undisputed Material Facts (MFs) separately, the Court reviews the facts under each claim in a section entitled "Discussion." The MFs are taken from the parties' pleadings and exhibits and are undisputed unless otherwise noted.

[5] It is possible that Plaintiff intended some of the "failure to promote" allegations to support only the race discrimination claim rather than the ADEA claim, but it simply is not clear. *See* Response at 25, Additional Fact No. "L" (alleging Plaintiff was turned down "for at least three internal promotions" based on her age). In an abundance of caution, the Court will discuss all of the "failure to promote" allegations in relation to both claims.

file to determine who to hire for a position. Plaintiff's Dep. at 107–109, Ex. B (Appx 0081–0082).[6] According to Plaintiff, this meant that SWC would review the files of 350 employees every time there was a job opening to determine if employees were qualified for the job opening, rather than requiring interested employees to submit new applications specific to the job opening. SWC disagrees.[7]

Plaintiff has created substantial confusion about the positions or promotions that she contends she was "passed over" based on age.[8] That confusion is compounded by Plaintiff's continued pursuit of claims that the Court previously determined were not administratively exhausted and could not be pursued. *See* discussion *infra*. The Court discusses Plaintiff's failure to promote allegations in relation to: 1) job openings or promotions that occurred in 2009 and 2010; and (2) job openings or promotions that occurred in 2012 and 2014.[9]

---

[6] The parties' 400 plus pages of attachments are identified by exhibit letters and numbers, but those pages also may contain appendix numbers, document production numbers, and electronic docket page numbers. The Court identifies the exhibits by letter for SWC and by number for Plaintiff and also uses the corresponding appendix page number for clarification. Thus, a reference to Plaintiff's Dep. at 107–109, Ex. B (Appx 0081–0082) indicates it is SWC's exhibit containing Plaintiff's Deposition at transcript page numbers 107–109, which is also located at SWC's Appendix pages 0081 and 0082. A citation to Plaintiff's Dep. at 47, Ex. 1 (Appx 0047) is to Plaintiff's exhibit and to deposition transcript page 47, rather than to the docket page number used by Plaintiff. Deposition transcript page 47 is also found by referring to "Hartwell 0047" which the Court refers to as Appx 0047.

[7] Plaintiff's testimony about whether SWC required applications specific to job openings is inconsistent. On the one hand, she contends that SWC does not require an employee to file an application for a specific job opening, but she also claims that she filled out at least two or three applications specific to jobs that opened in 2009 or 2010. Plaintiff's Dep. at 110–12, Ex. B (Appx 0082). SWC produced evidence that it had no record of Plaintiff having applied for a position after 2011. Jackson Aff. ¶ 28, Ex. A (Appx 0007).

[8] During her deposition when first asked to identify the positions Plaintiff did not receive because of alleged discrimination, Plaintiff stated she would have to "refer back to my notes." Plaintiff's Dep. at 90, Ex. B (Appx 0078). She then stated that she knew one of the jobs was "an intake lab tech," but was "still thinking" about other jobs she did not receive. Finally, Plaintiff stated she needed to look at the allegations in the Complaint. *Id.*

[9] If the Court has misunderstood Plaintiff's support for her ADEA claim or any other claim, Plaintiff may file an appropriate motion for reconsideration that identifies for the Court any additional support for a claim to which she specifically referred in her Response to the Motion for Summary Judgment, along with the corresponding citations to the record.

1.      *2009 and 2010 Positions*

In her deposition, Plaintiff testified that she believed she should have received a

1) "cultures" job[10], in 2009 that SWC filled with a 22 or 23-year old white woman, 2) a "cheese

production assistant manager" position in 2009 or 2010, 3) an "intake lab tech position" in 2010,

4) a "lab intake lab tech" position in 2010, and 5) a "safety position" in 2010. Plaintiff's Dep. at

90–100, 106–122, 132–147, Ex. B (Appx 0078–0085, 0087–0090). Plaintiff admits that she did

not submit an application specific to a number of these positions. *See* SWC's MF Nos. 38–41

and Plaintiff's MF No. 1 (admitting certain facts in MF Nos. 39–41). Without identifying

specific dates, Plaintiff also argues that she was turned down "for at least three internal

promotions because of her age." Response at 25, Plaintiff's Additional Fact No. "L." The

supporting deposition testimony, Plaintiff's Dep. at 142, Ex. 1 (Appx 0043), appears to refer to

Plaintiff's earlier testimony in her deposition concerning the 2009 and 2010 positions.

Previously, the Court reviewed Plaintiff's failure to promote allegations and concluded

that Plaintiff had administratively exhausted only the one claim that she was passed over for a

"Quality Assurance" job in 2014. Doc. No. 43 at 53–54. In a later decision granting in part and

denying in part Plaintiff's Motion to Amend, the Court again clarified that Plaintiff had

exhausted her ADEA claim "only as to her failure to receive a promotion to a Quality Assurance

position in January 2014." June 7, 2016 Memorandum Opinion and Order at 15 (Doc. No. 44).

Thus, Plaintiff may not pursue the unexhausted claims pertaining to job openings or promotions

that occurred in 2009 or 2010.

---

[10] The Court generally does not capitalize the titles of positions for which Plaintiff contends she was passed over because Plaintiff seems uncertain of the names of these positions. *See, e.g.,* Plaintiff's Dep. at 91, Ex. B (Appx 0078) ("I can't recall the other one's name but it was one that checked the cultures."). Plaintiff's counsel also did not capitalize the names of possible jobs Plaintiff sought. *See* Response at 11, Plaintiff's MF No. 15i.

2.       *2012 and 2014 Positions*

Although the Court expressly allowed Plaintiff to proceed with only the one claim about a January 2014 Quality Assurance position, Plaintiff offers no specific testimony about a quality assurance job opening in January 2014. *See, e.g.,* Plaintiff's Dep. at 276, Ex. B (Appx 0113A) (discussing a February 2014 position); Response at 11 Plaintiff's Fact No. 16i–iii (referring to job openings in 2012 and February 2014). In fact, during her deposition, Plaintiff initially did not discuss any positions that were available in 2012 and 2014. But, when her attorney began reading the allegations in the Complaint to Plaintiff, she remembered some jobs which she believes she should have been awarded.

| | |
|---|---|
| Plaintiff's counsel: | Were you passed over for jobs between 2011 and 2014? |
| Answer: | Yes. |
| Defense counsel: | Object, asked and answered. |
| Question: | The quality assurance position in 2012? |
| Answer: | Correct. |
| Question: | Assistant lab team leader in 2012? |
| Answer: | Correct. |
| Question: | And then a – in February of 2014, there is an assistant safety director production manager type job? |
| Answer: | Correct. |

Plaintiff's Dep. at 275–76, Ex. B (Appx 0113A). *See also* SAC ¶ 38 xv (allegations about these same positions and possibly others).

In her Response, Plaintiff argues that in February 2014, SWC gave a "quality assistant job" to a white male who Plaintiff actually trained. Response at 11, Plaintiff's Fact No. 16iii.[11] Plaintiff also asserts that SWC "had a policy and practice of hiring less qualified workers under 40 for jobs that Plaintiff was much more qualified for at SWC." Response at 26. Plaintiff's primary support for the allegation of a "policy and practice" consists of her own conclusory statements that she "was interested in three jobs, and within the time period of the jobs that I was interested in, they was all denied." Plaintiff's Dep. at 142, Ex. 1 (Appx 0043).

SWC produced evidence that there was no Quality Assurance job that opened in February 2014. SWC's MF No. 32. SWC also offered evidence that it posted a position of Quality Lab Tech I in late 2013, that it filled on January 31, 2014, but that Plaintiff did not apply for the position. SWC's MF No. 33. SWC also had an opening for a Quality Lab Assistant Team Leader that it posted on January 16, 2014, but Plaintiff did not apply for that position. *Id.* Even if Plaintiff could show that she applied for job openings that actually occurred in 2012 and 2014, she offers absolutely no evidence describing the qualifications of these positions or that she had the skills and experience to satisfy the qualifications of the positions. A "plaintiff can make such a showing by presenting credible evidence that [she] possesses the objective qualifications necessary to perform the job at issue." *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1274 (10th Cir. 2006). Thus, Plaintiff's allegations about job openings that occurred either in 2012 or in 2014, or in both years, cannot withstand summary judgment.

In support of her ADEA assertions under Count K, Plaintiff relies almost exclusively on conclusory and vague allegations and points to alleged denials of positions involving

---

[11] Due to Plaintiff's confusing, contradictory, and vague allegations and testimony, it's difficult to know whether the Court already had determined that some of these specific claims about 2012 and 2014 job openings were unexhausted. *See* Doc. No. 43 at 51 (finding allegations regarding 2013 job openings for a "Team Leader" position filled with a 22-year-old female, an "Assistant Quality Assurance" position filled with a 26-27-year-old woman, and an Assistant Team Leader position were not exhausted and could not be used to support the ADEA claim).

unexhausted claims. Plaintiff fails to identify admissible evidence sufficient to raise a genuine dispute of material fact that she was denied a promotion or position based on age discrimination. Therefore, the Court will grant SWC summary judgment on the ADEA claim (Count K), which will be dismissed with prejudice.

II.      Section 1981 Race Discrimination and Hostile Work Environment Claim (Count J)

     A.      *Pertinent Legal Standard*

"'Section 1981—which declares that all persons shall have the same right... to make and enforce contracts...as is enjoyed by white citizens—prohibits... racial discrimination' in the workplace." *Lounds v. Lincare, Inc*., 812 F.3d 1208, 1221 (10th Cir. 2015) (citation omitted). Stated differently, § 1981 prohibits discrimination based on race. *Runyon v. McCrary*, 427 U.S. 160, 167 (1976). The statute "does not apply to sex or religious discrimination." *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir. 1979). Thus, the Court does not consider any argument by Plaintiff pertaining to alleged sex discrimination. *See, e.g.,* Response at 30–31 (alleging that SWC employee grabbed "female sexual anatomy and otherwise engaged in sexual assault and battery," "hosed down" women at work, including Plaintiff, and made "inappropriate sexual comments" at work). However, § 1981 does authorize a claim for hostile work environment that is based on impermissible race discrimination. *Lounds*, 812 F.3d at 1221.

     A § 1981 claim is subject to a four year statute of limitations. *See Cross v. Home Depot*, 390 F.3d 1283, 1288–90 (10th Cir. 2004) (concluding that § 1981 claims relating to conduct occurring after an employee is hired are subject to a four year, as opposed to a two year, statute of limitations so long as they do not involve new contract formation). *See also Aman v. Dillon Companies, Inc.,* 645 F. App'x 719, 723 (10th Cir. 2016) (recognizing that an employee "must file a civil complaint under § 1981 within four years of the alleged conduct").

Plaintiff articulates four theories in support of her § 1981 race discrimination claim: 1) failure to promote, 2) hostile work environment, 3) disparate treatment, and 4) wrongful termination of employment.

B.     *Discussion*

1.     <u>*Failure to Promote*</u>

To satisfy the prima facie elements of a failure to promote claim under § 1981, the plaintiff must demonstrate that: (1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) she was rejected despite being qualified for the position; and (4) the position was filled or remained available. *Paris v. Sw. Bell Tel. Co*., 94 F. App'x 810, 812 (10th Cir. 2004) (citations omitted), *cert. denied*, 543 U.S. 1005 (2005)..

Plaintiff contends that between 2009 and February 2014, SWC discriminated against her on the basis of race by failing to promote her to the positions of "lab tech, cheese production assistant manager, quality assurance, assistant lab team leader,[12] and assistant safety director." Response at 28. Plaintiff impermissibly relies on allegations that the Court had already determined could not be pursued in view of § 1981's four year statute of limitations. *See* Doc. No. 44 at 14 (finding allegations about discrete events that predate December 7, 2011, could not be used to support § 1981 race discrimination claim). Thus, all evidence concerning job openings in 2009 and 2010 are time-barred. *See, e.g.,* Plaintiff's Dep. at 106, 119, 132, 141, Ex. 1 (Appx 0081, 0084, 0087, 0089) (discussing positions that opened in 2009 and 2010).

Plaintiff also testified that she was passed over for a "quality assurance position" in 2012, an "assistant lab team leader" in 2012, and an "assistant safety director production manager type

---

[12] Although Plaintiff's counsel placed a comma between "quality assurance" and "assistant lab team leader," indicating two positions, the "quality control manager assistant team leader" appears to be one position. *See* Plaintiff's Dep. at 118, Ex. B (0084).

job" in February 2014. *Id.* at 276 (Appx 0131). Allegations about these job openings are not time-barred.

However, the claims concerning these three more recent job openings do not survive summary judgment.[13] For one thing, Plaintiff's purported evidence of race discrimination consists of self-serving opinions and summary conclusions. *See* Plaintiff's Dep. at 103, Ex. 1 (Appx 0021) (Plaintiff contended she was more qualified than Hispanic employee who received position and that favoritism was at play); *Id.* at 105 (Plaintiff believed a manager had hired "three peoples" in other positions and that "neither one was black or female"); *Id.* at 115 (Plaintiff asserted that "the three guys [who] were up for [the cheese production assistant manager]" were white and had only been at SWC for six months). Thus, Plaintiff jumps to the self-serving conclusion that SWC's hiring decisions must have been based on impermissible race discrimination since white or Hispanic males received certain positions. Yet, Plaintiff admits she does not know the reasons for the managers' hiring decisions or the qualifications of the employees who filled specific positions. *See id.*

In addition, Plaintiff fails to produce any evidence about the required qualifications of each position she sought or her ability to meet the specific job requirements. Without evidence showing she was qualified to perform the jobs in question, Plaintiff cannot satisfy a prima facie case of failure to promote based on race. *See Castille v. Teletech Customer Care Mgt. (Co.), Inc.*, 56 F. App'x 895, 897 (10th Cir.) (listing required elements of the claim), *cert. denied*, 540 U.S. 836 (2003). *See also Burgis v. NYC Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir.) ("Without any specificity as to the qualifications considered for each person and without any reference to specific statements or individual circumstances that suggest discriminatory treatment, plaintiffs'

---

[13] Counsel summarily states that all of the jobs, possibly including the 2009 and 2010 job openings, "were well within the applicable statute of limitations period." Response at 28–29. Yet, counsel does not cite the applicable statute of limitations.

allegations do not support a finding that defendants acted with a discriminatory purpose."), *cert. denied*, 136 S.Ct. 1202 (2015).

Because Plaintiff has not produced evidence to satisfy all of the required prima facie elements, the Court will grant summary judgment to SWC on the race-based failure to promote claim, which will be dismissed with prejudice.

2. *Hostile Work Environment Based on Race*[14]

To establish a prima facie case for a racially hostile work environment, a plaintiff must show: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her race; and (4) due to the harassment's severity or pervasive-ness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *See Lounds*, 812 F.3d at 1222 (citation omitted). To show that the alleged harassment is severe or pervasive, the plaintiff must satisfy objective and subjective standards. *Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1023 (10th Cir.), *cert. denied*, 534 U.S. 1019 (2001). For example, a plaintiff must supply evidence that she subjectively perceived the environment to be abusive and that a "reasonable person" would have found the same harassment so severe and pervasive as to be objectively hostile or abusive. *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012).

To avoid summary judgment, a plaintiff must present evidence that creates a genuine dispute of material fact as to whether "the workplace is permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions

---

[14] To the extent that Plaintiff alleges she was the victim of a sexually hostile work environment or of sexual harassment, *see* Response at 24–25 ¶¶ D, E (alleging sexual assault or harassment in 2008 and 2009, related to allegations that an employee sprayed cold water on women employees), Plaintiff did not exhaust required administrative remedies. *See* Doc. No. 44 at 6 (denying Plaintiff's motion to amend complaint to claim of sex-related hostile work environment under the New Mexico Human Rights Act and/or Title VII because Plaintiff failed to exhaust any sexual harassment claims). *See also* Doc. No. 43 at 18–19.

of the victim's employment." *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir.), *cert. denied*, 552 U.S. 993 (2007). A plaintiff cannot merely rely on isolated or "sporadic racial slurs" to support a race-related hostile work environment claim. *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). Rather, there must be a "steady barrage of opprobrious racial comments." *Id.*

In reviewing a hostile work environment claim, the Court considers a totality of the circumstances and considers factors including whether: the conduct is frequent and severe;  the conduct is physically threatening or merely an offensive utterance; and the conduct unreasonably interferes with the employee's work. *Id.* A Court need not look only at the actions aimed at the plaintiff in determining the question of pervasiveness and severity; it may also consider harassment of others in the workplace. *Nieto v. Kapoor*, 268 F.3d 1208, 1218 n. 7 (10th Cir. 2001). This is because a key component of a hostile work environment claim is the environment. *James v. Frank's Westates Servs., Inc*., 747 F. Supp. 2d 1264, 1272 (D. Utah 2010) (citation omitted). In *Lounds*, the Tenth Circuit Court of Appeals observed that the "severity and pervasiveness evaluation is particularly unsuited for summary judgment" because it is "quintessentially a question of fact." *Lounds*, 812 F.3d at 1222 (citation omitted); *O'Shea v. Yellow Tech. Servs., Inc*., 185 F.3d 1093, 1098 (10th Cir. 1999).

Plaintiff claims that a number of SWC employees made racially offensive remarks to her or in front of her. When asked to list everyone who made these remarks, Plaintiff initially could not recall their names. Plaintiff's Dep. at 211, Ex. B (Appx 0105).

> Question: Tell me who first, just give me the list of who you heard use racially derogatory terms.

> Answer: I can't recall the names there were so many new hires coming back and forth.

Question: Do you recall any name of any person who used any racially derogatory comments in front of you at Southwest Cheese, other than –

Answer: I cannot recall their names.

*Id.*

However, when her attorney recited the allegations in the Complaint, Plaintiff agreed with counsel that Team Leader Danny Garcia, Tony Gar[za], and "Alias Garcia" all used the "n" word in front of her at times from as early as 2007 until sometime in 2012. *Id.* at 266–67 (Appx 0113). With prompting from her attorney,[15] Plaintiff also recalled that she had heard racial jokes in the break room about African Americans and that Justin Musick had once stated that President Barack Obama should have stayed in Kenya. *Id.* at 268. Plaintiff argues that she was "continuously humiliated and harassed" at SWC by employees and management who used the "n" word in front of her "on a frequent and continuous basis …." Response at 25 ¶ J.

With respect to more specific evidence of racially offensive conduct at work, Plaintiff describes an incident in 2007, where "a couple of [white] guys" in the break room would "continually" bring up the "n" word when Plaintiff entered the room. Plaintiff's Dep. at 211–12 (Appx 0105). Plaintiff does not know the men's names. Although Plaintiff says she complained to Brenda Miller, in Human Resources, Plaintiff does not know if Ms. Miller looked into the complaint. *Id.* at 212.

Plaintiff also asserts that several truck drivers complained to their supervisor in 2009 about a lab tech named Tim Rogers who called the drivers the "n" word. *Id.* at 304–308 (Appx 0120–0121); Plaintiff's Dep. at 269, Ex. 1 (Appx 0124). At first, Plaintiff stated she was present

---

[15]A non-movant's reliance on conclusory allegations from a complaint drafted by counsel is not sufficient to create a genuine dispute of material fact. *See Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011). *See also Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000) (at summary judgment, a plaintiff cannot rely on unsupported allegations and must go beyond the pleadings and provide evidence to support the existence of a genuine dispute).

when the truck drivers complained about Mr. Rogers, but then she admitted she was not there. Plaintiff's Dep. at 305, 307, Ex. B (Appx 0121). Plaintiff does not recall the names of the truck drivers who complained, and she has no personal knowledge as to what was discussed in a meeting about this matter.

In addition, Plaintiff states that in 2010 she was brought into an office with Ms. Miller and "Danny,[16] who were investigating an issue regarding "who was on the vat deck at the time the temperature wasn't checked." *Id.* at 213 (Appx 0106). Plaintiff reported that Danny said Plaintiff had used a swear word, and Plaintiff then complained to Ms. Miller that "there was employees running around saying 'nigger' and 'lesbians' and 'dykes,' and that … I didn't say the cuss word; so I complained to Ms. Miller about that incident." *Id.* Plaintiff had accused Danny or Borjas of using the words "lesbian" and "dyke," but she also heard them use the "n" word at work in 2010. *Id.* at 214 (Appx 0106). According to Plaintiff, Ms. Miller had no response and did not do anything to investigate Plaintiff's complaint. *Id.*

Plaintiff contends that in 2013, Mr. Musick stated in front of her and in reference to her: "This nigger is not going to get away with this." *Id.* at 197 (Appx 0102). Although Plaintiff alleges she suffered emotional distress by hearing this remark, she did not report Mr. Musick's comment to anyone. Other than her complaints to Ms. Miller in 2007 and 2010, Plaintiff does not remember having made any other complaints about racially offensive remarks at SWC. *Id.* at 215 (Appx 0106).

Plaintiff's evidence of racially offensive remarks in the workplace presents a close call. This is so because some of Plaintiff's more specific evidence dates back to 2007–2010, because parts of her testimony are vague and devoid of context, and because her attorney "refreshed"

---

[16] Plaintiff did not recall Danny's last name but testified that he was a team leader. Plaintiff's Dep. at 185, Ex. B (Appx 0099). He is probably Danny Garcia. *See* SAC ¶ 38i.

Plaintiff's memory by reading allegations from the Complaint. While on the one hand the alleged comments might be viewed as sporadic and isolated since the specific instances of offensive comments occurred in 2007, 2009, 2010, and 2013, Plaintiff also testified in her deposition that three different team leaders used the "n" word in front of her at times from 2007 until 2012, and that her supervisor referred to her using the "n" word in 2013. She also contends that she complained to Ms. Miller, SWC's Human Resources manager, on two different occasions about the use of the "n" word in the workplace but that the objectionable language continued.

Notably, the Tenth Circuit Court has instructed that "the word 'pervasive' is not [simply] a counting measure…. [and that it requires] a broader contextual analysis." *Lounds*, 812 F.3d. at 1223 (citation omitted). Stated differently, an actionable hostile work environment does not depend on the mere number of incidents, but also on the severity of the incidents. *Id.* The Tenth Circuit observed that some of its sister courts had offered "helpful commentary on the potentially strong polluting power of this the time-worn word, 'nigger.'" *Id.* at 1229 (citations omitted). As other courts have noted, "'perhaps no single act can more quickly alter the conditions of employment' than 'the use of an unambiguously racial epithet such as 'nigger' by a supervisor.'" *Id.* at 1229–30 (citations omitted). Even a single use of the "n" word  might be enough to establish a hostile work environment. *Id.*

After reviewing the totality of the circumstances and construing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has raised genuine disputes of material fact that she was subject to unwelcome harassment and that the harassment was based on her membership in a protected group. Plaintiff has adequately demonstrated that she subjectively perceived the environment to be abusive and that a "reasonable person" would have found that same harassment to be objectively hostile or abusive. In addition, the Court finds that

there are genuine disputes of material fact regarding the severity and pervasiveness of the alleged conduct, particularly where courts have determined that the question of a severe and pervasive hostile work environment is quintessentially a fact question. *See Lounds*, 812 F.3d at 1232 (hostile work environment claim is "particularly unsuited for summary judgment disposition").

SWC also takes the position that it is entitled to summary judgment on the hostile work environment claim because Plaintiff did not complain about the alleged harassment within the four-year limitations period and because Plaintiff has not presented evidence that she notified SWC of its obligation to take corrective actions. Motion at 30.

The Court finds that Plaintiff's evidence of complaints to SWC's Human Resources manager in 2007 and 2010 is sufficient to raise a genuine dispute of material fact regarding SWC's notice about the use of racially offensive remarks in the workplace. While Plaintiff's complaints in 2007 and 2010 occurred well before the applicable four-year statute of limitations began to ran on December 7, 2011, the Court previously allowed Plaintiff to support her hostile work environment claim with allegations of racial epithets dating back to 2007, notwithstanding the limitations issue. Doc. No. 44 at 12. The undersigned judge reasoned that the use of offensive language was within "the scope of the same hostile work environment," citing a case for the proposition that the allegations of events outside the filing period might be related by "type, frequency, and perpetrator." *Id.* (citation omitted). Although there are questions about the commonality of the perpetrators, the Court concludes that the hostile work environment claim is

better resolved by a jury. Thus, the Court will permit Plaintiff to rely on evidence of racially offensive remarks and corresponding complaints dating from 2007 to 2013.[17]

The Court concludes there are genuine disputes of material fact regarding the elements of Plaintiff's § 1981 hostile work environment claim. Therefore, the Court will deny SWC's Motion and will permit the race-based hostile work environment claim (one theory of Count J) to proceed.

### 3. *Disparate Treatment Discrimination*

To satisfy the prima facie elements of racially-based disparate treatment discrimination, a plaintiff must show "(1) membership in a protected class, (2) [an] adverse employment action, and (3) disparate treatment among similarly situated employees." *Dean v. Boeing Co.*, 260 F. App'x 124, 128 (10th Cir. 2008) (*citing Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)). "[A] claim of disparate treatment ... embod[ies] a situation where 'the employer simply treats some people less favorably than others because of their race, color, religion or national origin.'" *Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 448 (10th Cir. 1981) (citation omitted).

"[F]ederal discrimination laws do not require employers to treat all employees equally; rather, they prohibit employers from meting out unequal treatment based upon race. [] [I]t must again be stressed that a plaintiff suing under Title VII or section 1981 must produce evidence of discriminatory intent or motive in order to establish a prima facie case of discriminatory disparate treatment." *Clark v. Atchison, Topeka & Santa Fe Ry. Co.*, 731 F.2d 698, 702 (10th Cir. 1984).

---

[17] Plaintiff should not interpret the Court's ruling as any indication about the strength of the evidence she relies on to support the hostile work environment claim. Nor should Plaintiff attempt to throw her "kitchen sink" of allegations about stalking, a death threat, failure to promote, disparate treatment, sexual harassment, and/or retaliatory discharge in an attempt to support a hostile work environment claim. The Court's ruling is narrow. Evidence of a § 1981 racially hostile work environment must be linked to racial animus. *See Bolden*, 43 F.3d at 551.

Plaintiff asserts that African American employees at SWC were disciplined or treated more harshly than white employees. Plaintiff's Dep.. at 215, Ex. B (Appx 0106). Like most of her claims, Plaintiff's details of alleged disparate treatment are lacking. For example, Plaintiff states that an African American employee named "Josh" received verbal discipline, a write-up, and a suspension for an unspecified infraction in 2013. But, Plaintiff does not know Josh's full name or his supervisor's name.[18] Plaintiff compares Josh to Mr. Musick who "didn't put color nor rennet in the cheese, and it cost the company $450,000, around that amount" but who did not receive any discipline. *Id.* at 216–17 (Appx 0106–0107). Plaintiff admits that the two infractions were totally different. *Id.*

Plaintiff also represents that a "mixed race" employee named "Matthew" was disciplined or terminated for not "taking enough tankers on time." *Id.* at 218 (Appx 0107). Plaintiff does not know Matthew's last name and has no personal knowledge about the discipline he received. *Id.* at 218–221 (Appx 0107–0108). With respect to white employees who allegedly were not disciplined as harshly for the same type of infraction, Plaintiff does not recall any names. *Id.* at 221 (Appx 0108).

In addition, Plaintiff claims that African American employees were treated more harshly than white employees with respect to accommodations for medical restrictions. Again, Plaintiff offers very few details to support her allegations. She fails to identify a single African American employee, other than herself, whose medical restrictions were not accommodated. Instead, Plaintiff states that a white employee named Tammy Purser was placed in the front office after Ms. Purser broke a wrist in 2010. *Id.* at 222–23 (Appx 0108). Plaintiff does not contend that Ms. Purser suffered an on-the-job injury and does not know who at SWC made the decision to

---

[18] Upon her attorney's recitation of allegations in the Complaint, Plaintiff was able to recall Josh's last name and the pertinent "production manager" who disciplined Josh. Plaintiff's Dep. at 268, Ex. 1 (Appx 0123).

accommodate her. *Id.* Plaintiff asserts that another white employee, whose name she could not recall, was accommodated for a job injury in 2014. *Id.* at 224–26.

Other evidence supporting Plaintiff's disparate treatment claim includes: (1) failing to discipline Tim Rogers, a white male employee, for using racially offensive language in 2009; (2) requiring Plaintiff to eat her food outside the plant while unidentified white male employees brought their food inside the plant; (3) requiring Plaintiff to relieve vat deck operators for a period of a month in 2010, while other unnamed employees were not asked to do this work; (4) disciplining Plaintiff in 2013 for "not taking tankers properly on time" and creating a backup at the plant; *Id.* at 197 (Appx 0102); (5) falsely accusing Plaintiff of taking a tanker without seals in 2012, which was found to have no merit by an African American Human Resources Manager; (6) disciplining Plaintiff for wearing a tongue ring at work in 2014, when white employees were not disciplined for wearing tongue rings in 2008, 2010, and 2013; (7) failing to give Plaintiff advance answers to an examination when SWC provided three white employees answers to the exam; and (8) terminating the employment of an unidentified black female who was ready to return to work after having been on FMLA leave.

Plaintiff's scattershot approach to alleging disparate treatment race discrimination, which attempts to collect every conceivable complaint Plaintiff might have had or that she might have heard other employees had experienced over an eight year period, is riddled with problems. First, unlike the hostile work environment allegations that the Court allowed to proceed, even though outside the limitations period, Doc. No. 44 at 12, any allegations of disparate treatment from 2008 to December 7, 2011, are time-barred under the four year statute of limitations. Doc. No. 44 at 14.

Next, some of the allegations of disparate treatment, e.g., requiring Plaintiff to eat outside the lab or to give breaks to vat deck operators for a month, falsely complaining about Plaintiff on one occasion, and failing to give Plaintiff answers to an exam, lack evidence of the required adverse employment action. *See Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998) (adverse employment action required to show prima facie case of disparate treatment). An adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significant different responsibilities, or a decision causing a significant change in benefits." *Stinnett v. Safeway, Inc*., 337 F.3d 1213, 1217 (10th Cir. 2003). While Plaintiff disagreed with some of her job assignments, her disagreement and displeasure are not evidence of "a significant change in employment status." *See, e.g., Chung v. El Paso Sch. Dist. #11,* No. 15-1297, 2016 WL 4258835, at *2 (10th Cir. Aug. 11, 2016); (unhappiness with lateral reassignment does not establish adverse action); *Jones,* 617 F.3d at 1279 (a mere inconvenience or alteration of job responsibilities does not constitute adverse action, but adverse action found where plaintiff's salary and benefits were reduced); *Clegg v. Ark. Dep't of Corr*., 496 F.3d 922, 926-27 (8th Cir. 2007) (unpalatable or unwelcome changes to job duties that cause no materially significant disadvantage are not adverse actions).

Plaintiff was not disciplined in relation to the 2012 false accusation by a manager about taking a tanker without seals. And, while Plaintiff complains that she was disciplined for wearing a tongue ring, Plaintiff's Dep. at 253, Ex. 1 (Appx 0109), there is no documentary evidence of formal discipline; rather, she may have been verbally counseled to remove the tongue ring. Regarding SWC's failure to give Plaintiff answers to an exam before she took the test, Plaintiff

testified that she "aced" the exam.[19] Plaintiff's Dep. at 239, Ex. 1 (Appx 0096). Plaintiff is

unable to demonstrate that she suffered a significant change in employment status as a result of

the alleged disparate treatment. *See Faragalla v. Douglas Cty. Sch. Dist. RE 1*, 411 F. App'x

140, 155 (10th Cir. 2011) (noting plaintiff's claim of § 1981 disparate treatment, i.e., that she

was given a heavier caseload than others and excessive work assignments, lacked evidence of an

adverse employment action in relation to the objectionable treatment).

      Other allegations of disparate treatment do not pertain to Plaintiff at all, e.g., discipline of

"Josh" and "Matthew." Thus, these allegations are not linked to evidence that Plaintiff suffered a

related adverse employment action.[20] Moreover, virtually all of the allegations of disparate

treatment are bereft of context and detail. Plaintiff rarely knows the full names of the employees,

the dates of the incidents, the types of infractions at issue, the supervisors who might have issued

discipline, or the results of the discipline.

      Plaintiff's "failure to accommodate" disparate treatment theory is unavailing because it is

a backdoor approach to a claim Plaintiff did not bring, i.e., alleged disability discrimination.

Even if a claim based on "failure to accommodate" could be pursued, Plaintiff fails to show that

the employees who SWC purportedly accommodated were similarly situated to Plaintiff with

respect to the employees' medical restrictions and needs.  Additionally, Plaintiff presents no

evidence about the individuals who made specific accommodation decisions, and/or the positions

that were available at SWC. An inference of racial discrimination is shown where there is

evidence that an employee receiving allegedly differential treatment is similarly situated with the

---

[19] Plaintiff also clarified later in her deposition that it was not as if the actual answers to the exam were posted or provided to other employees. Rather, there were certain typed procedures that related to the exam that had been posted. Plaintiff's Dep. at 289–293, Ex. B (Appx 0117–0118).

[20] Plaintiff's counsel does not even mention any of the prima facie requirements of a disparate treatment claim, including the element of an adverse employment action. *See* Response at 28–31 (lumping together arguments about § 1981 failure to promote with other possible theories of discrimination).

plaintiff. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007). Plaintiff has not offered any "similarly situated" evidence.

In sum, most of Plaintiff's evidence about accommodations and alleged disparate treatment is so vague as to be no evidence at all. Even viewing the evidence in the light most favorable to Plaintiff, the Court is not required to make unreasonable inferences in favor of the non-moving party. *Llewellyn v. Allstate Home Loans, Inc*., 711 F.3d 1173, 1187 (10th Cir. 2013). Therefore, the Court will grant summary judgment to SWC on Plaintiff's § 1981 disparate treatment theory, which will be dismissed with prejudice.

### 4. *Termination of Employment*

In order to satisfy the prima facie requirements for a race-based termination of employment, a plaintiff must demonstrate that (1) she was a member of a protected class; (2) she was qualified and satisfactorily performing her job; and (3) she was terminated under circumstances giving rise to an inference of discrimination. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004). To survive summary judgment on a claim alleging termination of employment based on race, Plaintiff must show, through direct or indirect evidence, that the discrimination was intentional. *See EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1191 (10th Cir. 2000).

If there is no direct evidence of discrimination, the claim is analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Thus, if Plaintiff meets her burden of establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the termination. *See id*. If Defendant

satisfies its burden, the burden shifts back to Plaintiff to provide evidence showing that Defendant's proffered reasons are a pretext for racial discrimination. *See id.*

Plaintiff can satisfy the prima facie elements of her discriminatory discharge claim even though she does not discuss any of the required elements of the claim. *See* Response at 28–31. Plaintiff belongs to a protected category and suffered an adverse employment action when SWC terminated her employment, effective July 3, 2014. It does not appear to be in dispute that Plaintiff was satisfactorily performing her job and that Plaintiff's job was eventually filled.[21] However, Plaintiff has no direct evidence that SWC intentionally discriminated against her based on race. Thus, the Court analyzes the claim in accordance with the *McDonnell Douglas* burden shifting framework.

SWC states that when Plaintiff returned to work in late June 2014, after her FMLA leave, SWC implemented modifications to allow her to perform her job in accordance with her physician's restrictions.[22] Within two days of her return to work, however, Plaintiff told SWC that she could not perform her modified job responsibilities without pain. Ms. Abrego then worked with Plaintiff to find an available position that met Plaintiff's doctor's restrictions and Plaintiff's additional, self-reported restrictions. According to SWC, Plaintiff's own list of restrictions prevented her from performing any available job. Ms. Abrego told Plaintiff there were no available jobs that she could do at that time and asked Plaintiff to go home pending further notice. In early July, SWC attempted to telephone Plaintiff five times[23] but could not reach her. Consequently, SWC concluded that Plaintiff had abandoned her job and terminated

---

[21] SWC argues that Plaintiff testified she could not satisfactorily perform her job at the time she was discharged because Plaintiff informed SWC that she was unable to work without pain even with modifications. Motion at 27. However, the Court will look at Plaintiff's performance of her position before her injury, and at that time, there is no evidence to show Plaintiff could not fulfill her job responsibilities.

[22] Although Plaintiff disputes that SWC modified her job responsibilities, she had to admit that it moved vials to a lower shelf so that Plaintiff would not have to reach as far.

[23] Plaintiff vigorously disputes that SWC attempted to reach her by telephone. Yet, Plaintiff's deposition testimony is inconsistent and utterly confusing as to this point. *See* discussion *infra*.

her employment for job abandonment. Thus, SWC has offered evidence of legitimate, non-discriminatory reasons for its termination decision: (1) its determination that there were no available jobs Plaintiff could perform with her restrictions and (2) its conclusion that Plaintiff had abandoned her employment when she failed to contact SWC.

Plaintiff must next produce evidence that SWC's proffered explanations for its decision were a pretext for intentional discrimination. *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010). Pretext is established by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jones*, 617 F.3d at 1280 (citation omitted). The Court does not decide if an employer's decision was "wise, fair or correct," but, rather whether the employer "honestly believed [the legitimate, nondiscriminatory] reasons [given] and acted in good faith upon those beliefs." *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004).

Plaintiff does not expressly argue that SWC's articulated reasons for its decision are pretextual. In fact, there is no mention of the term "pretext" in her Response. Plaintiff asserts that SWC initially said it could accommodate her restrictions and then, two days later, sent Plaintiff home "falsely claim[ing] that SWC could not accommodate her." Response at 29. According to Plaintiff, despite having a "stellar attendance record over an eight year period," and an excellent

annual evaluation, SWC terminated Plaintiff's employment "at the first opportunity."[24] *Id.* at 31.

Plaintiff argues that SWC should have been able to accommodate her in another position because "between 2007 and 2014 SWC had always been able to accommodate injured workers;" SWC had accommodated 25 non-African American employees with light duty "between 2010 and 2014;" and SWC had "consistently created [jobs] for white employees [with work related injuries] in the front office." *Id.* at 28, 29.

Ms. Abrego stated that generally between 2007 and 2014, SWC had been able to accommodate an injured employee who was on light duty. Ms. Abrego also testified that she initially believed Plaintiff's doctor's restrictions would allow Plaintiff to do her regular job with some modifications. Abrego Dep. at 21, Ex. 2 (Appx 0147). However, after Plaintiff told Ms. Abrego that the position was causing her pain and aggravation to her shoulder tear and after Plaintiff wrote down all the tasks that she felt she could and could not do, Ms. Abrego concluded there were no transitional duties at that time that would not cause Plaintiff further harm. *Id.* at 22 (Appx 0148).

Plaintiff also relies on SWC's response to an interrogatory in which SWC stated that it had placed 26 employees on light duty between 2010 and 2014, 13 of whom were Hispanic, 12 of whom were White, and one of whom (Plaintiff) was African American. SWC's discovery response explained that a restricted duty assignment was based on individual circumstances,

---

[24] The "first opportunity" might more accurately be described as having occurred when SWC counseled Plaintiff on numerous occasions, e.g., in 2006 after she failed training for a position, in 2007 for reports by other employees who were uncomfortable with Plaintiff's repeated use of profanity, several times in 2008 after Plaintiff failed to use proper testing protocol, in 2010 after Plaintiff failed to identify and  report problems regarding the proper transfer of milk, again in 2010 after Plaintiff failed to accurately record information in the milk tank manifest and when she failed to attend a mandatory safety briefing, and in January 2014 when Plaintiff was suspended for three days without pay after she disregarded numerous standard operating procedures and recorded inaccurate testing information. *See* Exhibits attached to Jackson Aff. ¶¶ 13–22, Ex. A. While Plaintiff does not always agree with the reasons for the discipline, for the most part she does not refute SWC's evidence that she received counseling or discipline.

skill, and the severity of the injury and that SWC does not maintain clerical or light duty tasks for employees on restricted duty.

In addition, Plaintiff claims that SWC could have accommodated her by having another employee help Plaintiff in the lab and/or by giving Plaintiff a job filing paperwork with another employee. Plaintiff admits that SWC explained that it either could not bring in extra help for her or and that the employee Plaintiff wanted to assist with filing duties already had another employee helping her.

The undisputed evidence is that even after SWC moved the vials to a lower shelf to accommodate the restrictions set by Plaintiff's doctor, Plaintiff reported to Ms. Abrego that she could not do her job in the lab without being in pain. Ms. Abrego testified that she was unable at that time to find a position that Plaintiff could perform. Plaintiff has not identified any available position at SWC that she could have performed with her restrictions.

With respect to SWC's determination that Plaintiff abandoned her job by failing to respond to SWC's telephone calls to her, SWC produced evidence that Ms. Jackson and Ms. Abrego attempted to telephone Plaintiff five different times between July 1 and July 3 to discuss Plaintiff's work restrictions and that Plaintiff failed to return their calls.

Plaintiff disputes having received any telephone calls from Ms. Jackson or Ms. Abrego on July 1, 2, or 3.  But, Plaintiff alleged in her Complaint that she received a call from Ms. Abrego at about 10:30 a.m. on July 1, 2014, asking Plaintiff to come in. SAC ¶ 34. Plaintiff's deposition testimony regarding possible communications with SWC on these dates is similarly inconsistent and confusing. *See* Plaintiff's Dep. at 12, 13, 15, 18, 19, 21, Ex. 1 (Appx. 0002–0007) (denying that Plaintiff had an appointment with Ms. Abrego on June 30th and denying that Plaintiff called on June 27th to cancel that appointment, yet admitting that she called Ms.

Abrego, perhaps on June 27th; denying that Plaintiff advised Ms. Abrego that Plaintiff would call SWC on June 30th to schedule an appointment on July 1st but admitting that Plaintiff called Ms. Abrego "[a]fter that time" to ask about workers' compensation and admitting that Ms. Abrego called her back at some point and wanted to set up an appointment with Plaintiff to discuss a document Ms. Abrego had given to Plaintiff; admitting that Ms. Abrego called Plaintiff "on Friday on [July] 6th" although Friday was July 4th, a holiday; admitting that she received a call at some point from Ms. Abrego first and then from Ms. Jackson the next day, or purportedly on Monday, July 7th).

Moreover, Plaintiff admits that after she received SWC's letter stating that SWC was terminating her employment based on job abandonment, she did not attempt to contact SWC to discuss the reasons for its termination decision.

The Court concludes that Plaintiff has failed to offer any evidence tending to show that SWC's proffered reasons for its termination decision were false, implausible, or inconsistent. Plaintiff has not produced evidence to contradict SWC's assertion that Ms. Abrego acted in a good faith belief that there were no available positions in late June 2014 that Plaintiff could perform with her restrictions. Nor does Plaintiff offer any evidence that draws into question SWC's stated reasons for its termination decision. Because Plaintiff has failed to present evidence of pretext, the Court will grant summary judgment to SWC on Plaintiff's wrongful termination claim. Accordingly, the Court will dismiss with prejudice Plaintiff's § 1981 race discrimination claim (Count J) as to the three theories of failure to promote, disparate treatment, and wrongful discharge. As stated previously, the § 1981 race-based hostile work environment claim (Count J) will proceed.

III.   <u>Employment Contract Claim</u> (Count F)

    A.    *Pertinent Legal Standard*

In New Mexico, employment generally is terminable at the will of an employee or an employer, absent an express contract to the contrary. *Sullivan v. America Online, Inc.*, 219 F. App'x 720, 722 (10th Cir. Feb. 12, 2007) (*citing Lopez v. Kline*, 124 N.M. 539 (1998)). However, an implied contract that limits an employer's ability to discharge an employee is an exception to the general rule of at-will employment. *See Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 668 (1993), *cert. denied,* 510 U.S. 1118 (1994).

In some instances, for example, an employer may create an implied employment contract based on written representations in an employment manual, by oral representations of management, or by a combination of representations and conduct. *See Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 426 (1989). But, "[a]n implied contract is created only where an employer creates a reasonable expectation" *Hartbarger*, 115 N.M. at 672. "The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." *Id.* A court examines the totality of the circumstances in determining the reasonableness of an employee's expectation of continued employment. *Id.*

"[U]nder New Mexico law, the existence of an implied contract of employment is a question of fact, and thus summary judgment is appropriate only if the evidence is insufficient to create a genuine issue of material fact regarding whether an implied contract was established." *Chavez-Acosta v. Southwest Cheese Co., LLC*, 610 F. App'x 722, 733 (D.N.M. Apr. 20, 2015) (concluding that the plaintiff had not overcome summary judgment on her implied contract claim).

B.      *Discussion*

Plaintiff complains that SWC breached "an oral contract of employment" in two ways. SAC ¶ 42. First, she alleges that SWC violated an implied contract, consisting of policies, practices, assurances and "express and implied statements" by terminating her employment without "advanced notice, opportunity to remediate deficiencies and [] good cause." *Id.* Second, Plaintiff asserts that SWC failed to pay her for all of the personal time she had accumulated when SWC terminated her employment. *Id.* ¶ 46.

1.      <u>At-Will Employment</u>

Plaintiff contends that SWC created an implied employment contract sufficient to defeat the presumption of at-will employment based on the following evidence: 1) when hired in 2006, a SWC Human Resources manager told Plaintiff that if she satisfied her 90-day probationary period, which she did, that she would be full time and that her employment could be terminated only for good cause or for good reason; 2) in 2006, a Human Resources director also told her that SWC fired employees for good cause or good reason; 3) in 2006, a SWC plant manager similarly told Plaintiff that her employment could be terminated only for good cause; and 4) SWC's written progressive discipline policy does not refer to SWC's at-will employment policy, and indicates, in part, that disciplinary action is progressive, beginning with verbal warnings and progressing through written warnings to termination.

Plaintiff also may rely on testimony elicited by her attorney from various SWC managers. For example, Ms. Abrego, Mr. Eric Denton, a SWC team leader, and Ms. Jackson all testified about their understanding that SWC generally terminated employment for a good reason and/or used the progressive discipline policy. But, Plaintiff offers no evidence to show that any of these

three managers spoke to her about their experiences that SWC would only terminate employment for good reason.

SWC maintains a written Employment At-Will Policy in its employment handbook for all production employees. The at-will policy states that the employee handbook is "neither a guarantee of employment nor an employment contract for any specific period or specific type of work. Either the employee or the company may terminate the employment relationship at any time and for any reason." Exhs. A-9, A-10 (Appx 0020–21). The only exception to the at-will policy is if an employee has a written statement signed by SWC's President/CEO. *Id.* Plaintiff does not have a written statement from SWC modifying the at-will policy.

SWC's May 16, 2006 offer letter to Plaintiff states that employment at SWC is "on an at-will basis. This means that the employment relationship may be terminated by either the employee or the company at any time, with or without notice, and for any reason not expressly prohibited by law." Ex. A-8 (Appx 0019). On May 16, 2006, Plaintiff signed this letter. Thus, Plaintiff understood that no manager, supervisor, or employee at SWC, other than its President or CEO, had the authority to alter the at-will employment policy.

Plaintiff received the employment handbook containing SWC's at-will policy, both in 2006, when SWC hired her and in 2013, when SWC modified its handbook. Plaintiff signed an acknowledgment form on May 24, 2006, stating that she had received the SWC handbook. The signed acknowledgment again sets forth SWC's at-will policy. Plaintiff understood the 2006 and 2013 employee handbooks containing the at-will policies.

Courts have previously found that "repeated unequivocal written declarations of [an individual's] at-will status, particularly when these declarations include one that explicitly preclude[s] oral modifications are more than enough to make unreasonable a plaintiff's belief

31

that her supervisor's statements and actions modified the at-will nature of her contract." *Chavez-Acosta*, 610 F. App'x at 733 (citation omitted) (internal quotation marks omitted). The evidence of written communications between Plaintiff and SWC throughout her employment confirms that her employment was at-will.

Plaintiff's reliance relies on verbal representations by a few SWC managers in 2006 is not sufficient, when viewed against SWC's unequivocal at-will employment policy, to demonstrate <u>reasonable</u> expectations by Plaintiff that she was entitled to progressive discipline before termination of employment or to a termination only for cause. *See, e.g., Chavez-Acosta*, 610 F. App'x at 733 (finding insufficient evidence to overcome summary judgment on implied contract claim by a different SWC employee, who relied on almost the same evidence presented by this Plaintiff); *Sullivan*, 219 F. App'x at 722 (company's four separate documents setting out at-will employment, one of which precluded oral modifications, supported the conclusion that the employee's expectation of progressive termination was not reasonable). Moreover, SWC's progressive disciplinary policy does not contain mandatory procedures that SWC supervisors and managers must utilize in every situation. *See* Ex. 6 (Appx 0215-216) (containing aspirational language about supervisors' and managers' responsibility to administer "high standards of discipline" and noting supervisors' and managers' discretion in placing an employee on a performance improvement plan and determining the appropriate discipline). In other words, the totality of evidence is insufficient to create a genuine issue of material fact that Plaintiff's at-will

employment at SWC was altered by verbal and written representations.[25] Therefore, SWC is entitled to summary judgment on the breach of implied employment contract claim.

2. *Payment of Personal Time*

SWC paid Plaintiff for a total of 87 hours of accrued personal time when her employment was terminated. But, Plaintiff contends that she was entitled to payment for the "approximately 300 hours of personal time that she had accumulated in breach of contract." SAC ¶ 46. She relies on statements in SWC's policies concerning severance pay for involuntary terminations of employment[26] and accrual of vacation days. Exhs. 24 and 25. Plaintiff also argues that she was entitled to 120 hours of vacation time and to 8 weeks of severance pay. Response at 22–23 ¶ 39 and at 26–27. It is not clear how Plaintiff arrived at 300 hours of time owed since Plaintiff's argument might be construed as a request for payment of 440 hours (120 hours plus 320 hours). However, she does not expressly request payment for 440 hours.[27]

In contrast, SWC offers specific affidavit testimony by Ms. Jackson as to how Plaintiff's final paycheck was calculated. Ex. A (Appx 0008). SWC pays terminated employees for unused vacation and personal time. At the time her employment was terminated, Plaintiff had accrued a total of 75 vacation hours (40 hours carried over from 2013, 35 hours accrued in 2014), but she had used 116 hours of vacation time and, therefore, owed SWC 41 hours of vacation time. *Id.* With respect to personal time, Plaintiff had accrued a total of 128 hours but because she owed 41

---

[25] Moreover, Plaintiff's reliance on SWC's progressive discipline policy is questionable where that policy expressly provides that "[a]ttendance infractions are treated separately from behavioral and performance issues." Ex. 6 (Appx 0215). The separate Attendance Policy states that "[a]ny employee that is a no call no show will be subject to immediate disciplinary action up to and including termination." Ex. 6 (Appx 0219). However, the Court recognizes that Plaintiff disputes that she abandoned her job and denies that she received a call from SWC in early July 2014 that she did not answer.

[26] The policy concerning Severance Pay states that it does not apply to terminations for cause. It is not clear whether Plaintiff was entitled to Severance Pay under the pertinent clause.

[27] SWC explains that Plaintiff seeks the "full amount of leave that she *could have* accrued in 2014 had she worked the entire year and not used any portion to receive payment for her otherwise unpaid FMLA leave." Reply at 7. Plaintiff offers no evidence why she would be entitled to personal time for the entire year of 2014.

hours of vacation time, those 41 hours were deducted from 128 hours, leaving a total of 87 hours for which she received payment.[28] *Id. See also* SWC's MF No. 60. Although Plaintiff states that she disputes SWC's MF No. 60, she offers no evidence why SWC's computation is incorrect and no evidence documenting how she was entitled to payment for more than 87 hours. Therefore, the Court concludes that Plaintiff has failed to raise a genuine issue of material fact and that SWC is entitled to summary judgment on her claim for payment of additional personal time. Accordingly, the Court will grant SWC summary judgment on the implied contract claim (Count F), which will be dismissed with prejudice.

IV.     Retaliatory Discharge Claims (Count G)

    A.     *Pertinent Legal Standard*

In New Mexico, a discharged at-will employee may recover in tort under a claim of retaliatory discharge when her discharge contravenes a clear mandate of public policy. *Chavez v. Manville Prods. Corp.*, 108 N.M. 643, 647 (1989). To recover for retaliatory discharge, an employee "must demonstrate that [she] was discharged because [she] performed an act that public policy has authorized or would encourage, or because [she] refused to do something required of [her] by [her] employer that public policy would condemn." *Vigil v. Arzola*, 102 N.M. 682, 689 (Ct. App. 1983), *rev'd in part on other grounds*, 101 N.M. 687 (1984), *overruled in part by Chavez v. Manville Prods. Corp.*, 108 N.M. 643, 649 (1989. *See Shovelin v. Cent. N.M. Elec. Co–op*, 115 N.M. 293, 303 (1993) (discussing elements of claim)

    B.     *Discussion*

Plaintiff contends that SWC discharged her in retaliation for 1) "the suit I had against [SWC] as far as workmen's comp," and 2) "for the letter that I submitted as to OSHA." Plaintiff's Dep. at 123, Ex. B (Appx 0085). *See SAC* ¶¶ 49, 50, 51.

---

[28] Even if 87 hours are deducted from a possible request of 440 hours, this results in 353 hours, not 300 hours.

1. *Workers' Compensation*

Plaintiff provides no evidence that would support an inference of retaliatory motive

linking Plaintiff's claim for workers' compensation to SWC's decision to discharge Plaintiff.

The undisputed evidence is that on October 3, 2013, the date of Plaintiff's on-the-job injury,

SWC filed a workers' compensation claim on her behalf. Plaintiff was "placed on" workers'

compensation on March 27, 2014 and then again on June 28, 2014.[29] Plaintiff's Dep. at 150, Ex.

1 (Appx 0046). Plaintiff spoke both to Ms. Abrego and Ms. Jackson about her workers'

compensation claim and admits they did not discourage her from seeking workers'

compensation. Plaintiff concedes that SWC worked with her regarding her claim for workers'

compensation and that she received all of the workers' compensation to which she was entitled.

Moreover, Plaintiff's evidence of a causal connection between her worker's

compensation claim and SWC's termination of her employment is weak. Stated differently, the

temporal proximity between the workers' compensation claim, filed October 3, 2013, and the

date that Plaintiff was discharged, effective July 3, 2014, is lacking. Eight months passed from

the date SWC filed for workers' compensation on Plaintiff's behalf before SWC terminated

Plaintiff's employment. Courts have held that a gap of three months between an employee's

protected activity and the adverse employment action, standing alone, is insufficient to establish

causation. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). *See also*

*Muller v. Islands at Rio Rancho Homeowners Ass'n*, No. CV 13-351 LFG/RHS, 2013 WL

12157872, at *7 (D.N.M. Oct. 4, 2013) (collecting cases holding that in retaliation cases, it is

well-settled law that a gap of three to four months between protected activity and adverse action

---

[29] Since Plaintiff returned to work just days after her injury in October 2013 and continued to work for five months, she may not have received workers' compensation at that time. But, in March 2014, she took FMLA leave for about three months after a new doctor evaluated her condition. In June 2014, she returned to work but almost immediately reported continued pain while performing her work. Thus, she may have received workers' compensation in both March and June 2014.

is too remote to show causation). Here, an eight-month gap does not demonstrate the required causal link.

Plaintiff may, however, contend that there is a causal connection between her more recent requests for workers' compensation, e.g., when she <u>again</u> sought workers' compensation both in late March 2014, after she consulted with a new physician, and in late June 2014, after SWC concluded it did not have any available work to accommodate Plaintiff's doctor-ordered restrictions and Plaintiff's additional self-described limitations. But, when viewed in light of all the evidence, particularly where SWC assisted Plaintiff in obtaining workers' compensation and where there is no other evidence that SWC interfered with Plaintiff's request for workers' compensation, the Court concludes that Plaintiff has failed to supply sufficient evidence of a causal link to raise a genuine dispute requiring trial.

Plaintiff also asserts that a "safety guy" told someone that Plaintiff was not really hurt when the door hit her shoulder in October 2013. But, Plaintiff concedes that this "safety guy" was not involved in the termination decision. Plaintiff's Dep. at 153, Ex. 1 (Appx 0049). In addition, Plaintiff contends that SWC engaged in a pattern of discharging employees when they filed workers' compensation claims. *Id.* at 154 (Appx 0050). When asked to name all of the employees who had filed workers' compensation claims during Plaintiff's eight years of employment at SWC, Plaintiff identified one person and said she was unable to recall the names of three other employees. *Id.* With respect to the named employee, Plaintiff was not sure that the employee had filed for workers' compensation and did not know why that employee was discharged. Plaintiff's Dep. at 154, Ex. B (Appx 0092). Plaintiff offers no real details about the other three employees who she suspects had filed for workers' compensation. *Id.* at 155–157

(Appx 0092-0093). Plaintiff's evidence falls far short of showing that SWC terminated her employment in relation to her workers' compensation claims.

In contrast, SWC presented evidence that during Plaintiff's eight-year employment, 157 SWC employees filed for workers' compensation benefits. Of the 157 employees, 122 employees still worked at SWC or had voluntarily left their employment. Motion at 8, SWC's MF No. 8. Although Plaintiff attempts to dispute SWC's MF No. 8 by relying on various exhibits as support for 12 separate assertions, Response at 7–9, none of the evidence cited by Plaintiff actually contradicts SWC's evidence that from 2006 to 2014, 122 of the employees who had filed for workers' compensation either still worked at SWC or had voluntarily left SWC. Thus, SWC's evidence is undisputed.

After considering all of the evidence, the Court concludes Plaintiff has failed to raise any genuine disputes of material fact with respect to the first retaliatory discharge claim that is based on Plaintiff having filed for workers' compensation benefits. Thus, this retaliatory discharge claim (Count G) will be dismissed with prejudice.

### 2. *Safety Board Complaint*

On October 28, 2013, Plaintiff called the New Mexico Occupational Health and Safety Board (Safety Board) to report alleged workplace safety violations. Plaintiff complained that employees were: 1) not permitted to evacuate after a fire alarm activated for an unknown reason; 2) not notified or evacuated after a large ammonia leak the prior year; 3) reluctant to report injuries due to retaliation and harassment; and 4) exposed to chemicals used for cleaning trucks.

The Safety Board told Plaintiff her complaint would be anonymous[30] and it conveyed

Plaintiff's allegations to SWC without identifying her. Plaintiff did not inform anyone at SWC

that she had contacted the Safety Board. Plaintiff was not aware of anyone at SWC who knew

she had made the Safety Board complaint. Neither Ms. Jackson nor Ms. Abrego knew that

Plaintiff was the complainant when SWC terminated Plaintiff's employment.

SWC investigated the reported safety concerns and stated in a letter to the Safety Board,

dated November 4, 2013, that: 1) SWC had recently experienced false alarms during a system

upgrade but that department heads were notified in advance and false alarms were announced

over the public address system; 2) ammonia release logs confirmed no large ammonia leaks in

the last year and employees were trained on proper reporting and evacuation; 3) employees

receive annual harassment and retaliation training, and Human Resources agreed to conduct a

refresher training for all employees; and 4) employees were trained on and monitored for proper

procedure when cleaning trucks, and SWC's annual audit did not reveal any employee exposure.

Ex. D-4 (Appx 0139–0140). Based on SWC's response, the Safety Board notified Plaintiff that it

was closing the file (November 18, 2013 NMOSHA letter, Ex. J, App. 0171).[31]

Plaintiff has failed to rebut SWC's evidence that either Ms. Jackson, who made the

decision to terminate Plaintiff's employment, or Ms. Abrego, who conferred with Ms. Jackson

near the time Plaintiff was discharged, knew that Plaintiff had made a complaint to the Safety

Board. There is no causal connection to an adverse action if the decision maker does not know of

the protected activity. *See, e.g., Petersen v. Utah Dep't of Corr.,* 301 F.3d 1182, 1188 (10th Cir.

---

[30] Plaintiff contends that no one told her that the OSHA investigation into her complaint would be kept confidential. Response at 9, ¶ 11ii (citing Ex. 1, ¶¶ 9-11, apparently meaning Plaintiff's Dep. at 128 [Appx 0036] at lines 9-11). Plaintiff's deposition testimony indicates that she may not have understood the question. When asked if the Safety Board told her that her name would be kept confidential, Plaintiff answered "Not really." But when asked if the Safety Board told her the complaint would be anonymous, she said yes. *Id.*

[31] Although Plaintiff does not admit SWC's MF No. 28, she provides no evidence to dispute any of it. *See* Response at 9, ¶ 11. Therefore, the Court accepts SWC's MF No. 28 as fact.

2002) ("[A]n employer's action against an employee cannot be *because* of that employee's protected conduct unless the employer knows the employee has engaged in protected opposition.") (emphasis in original); *Montes v. Vail Clinic Inc.,* 497 F.3d 1160, 1176 (10th Cir. 2007) ("To satisfy [the causal connection] element, a plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity.

Plaintiff's additional evidence in support of this retaliatory discharge claim is unpersuasive. For example, Plaintiff contends that she told a supervisor, Mr. Musick, that there was an "OSHA violation" and/or that she was going to make an "OSHA report" regarding concerns she had about the fire alarm. Plaintiff's Dep. at 130, 248, Ex. 1 (Appx 0037, 0105). Plaintiff also alleges that on October 30, 2013, Mr. Musick said in front of Plaintiff that "This nigger is not going to get away with this." *Id.* at 198 (Appx 0068). Although upset by Mr. Musick's alleged comment, Plaintiff did not report the statement to SWC. *Id.* More importantly, it is undisputed that Mr. Musick played no role in the termination decision, despite Plaintiff's suspicions to the contrary.

In addition, Plaintiff states she complained about an ammonia leak at a safety meeting, which she believes upset her supervisor Eric Denton. Plaintiff contends that Mr. Musick and Mr. Denton watched her performance more closely after her internal complaints regarding safety issues, that both men called her a "whistleblower,"[32] and that she was disciplined unjustifiably for not performing her work correctly. Although Plaintiff alleges that Mr. Musick and Mr. Denton had the authority to fire her, it is undisputed that neither man had input into Ms. Jackson's decision to terminate Plaintiff's employment for job abandonment in July 2014.

---

[32] Plaintiff waffles about her claim that she was called a "whistleblower" She first stated that Mr. Musick called her a whistleblower because Plaintiff had complained about the fire alarm going off. Plaintiff then explained that Mr. Musick made the comment to another employee but Plaintiff could not identify the employee. Plaintiff's Dep. at 296, Ex. B (Appx 0118).

Plaintiff also contends that after she made her complaint to the Safety Board, the entire fire alarm system had to be re-wired. However, it is uncontested that SWC began upgrading the system in March 2013, many months before Plaintiff's October 2013 complaint to the Safety Board.

Plaintiff has failed to raise any genuine disputes of material fact with respect to her claim that SWC terminated her employment in relation to her October 2013 complaint to the Safety Board. Therefore, the Court will grant SWC summary judgment on both of Plaintiff's retaliatory discharge claims (Claim G), which will be dismissed with prejudice.

V.      Intentional Infliction of Emotional Distress (IIED) (Count H)

A.      *Legal Standard*

The elements of IIED are: 1) extreme and outrageous conduct; 2) that was intentional or in reckless disregard of the plaintiff; 3) where the plaintiff's mental distress was extreme and severe; and 4) where a causal connection exists between the defendant's conduct and the plaintiff's mental distress." *Baldonado v. El Paso Nat. Gas Co.*, 2008–NMSC–005, ¶ 27, 143 N.M. 288, 294. The conduct must be so extreme in degree as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community. *See Dominguez v. Stone*, 97 N.M. 211, 214 (Ct. App. 1981).

A three-year statute of limitations applies to IIED claims. *See* Doc. No. 43 at 30 (citing NMSA 1978 § 37–1–8). At the Rule 12(b)(6) stage, this Court already observed that under New Mexico law, the limitations period begins to run as soon as the plaintiff knows of the facts on which her claim is based. *Id.* (citation omitted). The Court also determined that although some of Plaintiff's allegations dated back to 2007, the alleged misconduct continued to May 2014, within the limitations period. Thus, the Court found that certain allegations pertaining to Plaintiff and

other women being sprayed with water at work from 2007 until May 2014 could be considered a

continuing tort that would not be time-barred. *Id.* at 30–31. *See id.* at 35 n.14 (Even though the

water spraying behavior occurred prior to the three year limitations period, the behavior was

related by type and frequency, even if not committed by the same perpetrator). However, the

Court made no similar findings of a continuing tort as to other allegations of wrongdoing.

      B.    *Discussion*

The Court separates Plaintiff's possible support for the IIED claim into three areas:

1)  miscellaneous wrongdoing; 2) water spraying; and 3) sexually offensive conduct and

remarks. However, the Court examines a totality of circumstances in analyzing the evidence in

support of the IIED claim. *See Padwa v. Hadley*, 1999-NMCA-067, 127 N.M. 416, 423 (noting

that it is the totality of the circumstances that is determinative in evaluating whether conduct is

extreme and outrageous).

      1.    <u>*Allegations of Miscellaneous Wrongdoing*</u>

Plaintiff first argues summarily that the "record is filled with specific, repeated, horrific,

barbaric instances, engaged in by supervisory personnel and ignored by Human Resources,

spanning over a significant period of time establishing material issues of fact." Response at 31.

However, Plaintiff's use of terminology like "horrific" and "barbaric" does not make it so.

Plaintiff may contend that her allegations of a failure to promote, the use of the "n" word,

and disparate treatment, etc. are continuing wrongs that escape the three-year limitations bar for

IIED claims. But, she did not make this argument under the section entitled "Intentional

Inflection of Emotional Distress" that consists of one long paragraph. Response at 31–32.

Moreover, many of the alleged wrongs arise from different times, to the extent Plaintiff has

identified dates, and are distinct in nature. *See  Duncan v. Mgr, Dep't of Safety, et al.,* 397 F.3d

1300, 1308–09 (10th Cir. 2005) (discussing "type, frequency, or perpetrator"). Thus, the Court concludes that a continuing tort theory does not save allegations of misconduct that occurred before December 7, 2012. In addition, as the Court already determined, many of Plaintiff's allegations of wrongs lack context and detail. Put differently, they are so vague that they cannot raise a genuine dispute of material fact regarding any claim, including the IIED claim.

Plaintiff also attempts to support the IIED claim with allegations of isolated or sporadic occurrences of conduct that she found objectionable, e.g., being "forced to open her mouth to expose a piercing while younger white females were not required to do the same humiliating act[,]" being called a "whistleblower" after she made her complaint to the Safety Board, and SWC's supposed request that Plaintiff make a false statement that an African American truck driver had "cursed out" an employee. *See* Response at 32. None of these allegations amount to the type of the extreme, outrageous and atrocious conduct that IIED covers.

For example, Plaintiff admits that she understood SWC's written policies that prohibit wearing tongue rings at work. Plaintiff's Dep. at 42–43, Ex. B (Appx 0070). She had been verbally instructed as early as 2009 not to wear a tongue ring at work. Jackson Aff. ¶ 15 (Appx 0004). Moreover, Plaintiff stated that she refused to open her mouth in response to a supervisor's instruction in 2014. Plaintiff's Dep. at 253, Ex. 1 (Appx 0109). The alleged instruction to open her mouth under these circumstances does not amount to extreme and outrageous conduct.

Regarding being called a whistleblower, Plaintiff equivocated about actually having heard someone say she was a whistleblower. She admits that Mr. Musick told another employee, not Plaintiff, that Plaintiff was a whistleblower although Plaintiff could not identify the employee who supposedly heard Mr. Musick's remark. Plaintiff did not complain about Mr. Musick's name-calling. *Id.* at 296–97 (Appx 0134–0135).

In relation to Plaintiff's allegations that she was asked to make a false statement about another African American employee, she refused to make the false statement. There is no support in the record that Plaintiff was actually removed from her position for a year in 2013 as a result of her refusal to make a false statement. None of the alleged conduct, whether considered separately or together, is the type of behavior that would "lead [a] citizen to spontaneously exclaim, 'Outrageous!'" *See Sawyer v. Sw. Airlines Co*., 243 F. Supp. 2d 1257, 1274 (D. Kan. 2003) (discussing similar Kansas state IIED claim), *aff'd*, 145 F. App'x 238 (10th Cir. 2005).

The same is true regarding Plaintiff's isolated allegations of stalking by Steve Campbell, a production manager, and the "death threat" by "Matthew." Although Plaintiff alleges that Mr. Campbell stalked her continuously for about two months in 2013 and 2014, her accusations are based on nothing more than having observed Mr. Campbell "standing in a window looking" towards her. Plaintiff's Dep. at 262, 301–02, Ex. B (Appx 0112, 0120).

Plaintiff also relies on allegations that a Matthew[33] threatened to kill her in 2013, although she notes that SWC terminated Matthew's employment. *Id.* at 264 (Appx 0112). When asked for more details about this incident, Plaintiff explained that Matthew said "he wanted to kill Plaintiff and another employee" for having supposedly complained about him. *Id.* at 265, Ex. B (Appx 0113). Telling someone that "I'd like to kill you for having reported me" is more like an empty threat or an expression of dismay or even banter rather than a serious death threat. "[L]iability [for the tort of outrage] clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Stock v. Grantham*, 1998-NMCA-081, 125 N.M. 564, 574–75.

---

[33] Plaintiff was not clear about Matthew's race. At one point, she testified that he was African American. Plaintiff's Dep. at 303, Ex. B (Appx 0120).

In sum, the Court finds that some of the above described allegations do not survive the pertinent time bar and may not be relied on in support of the IIED claim. With respect to the other miscellaneous evidence on which Plaintiff relies, none of it, even when considered together, demonstrates extreme and outrageous conduct sufficient to withstand summary judgment on the IIED claim.

2.    *Allegations of Water Spraying*[34]

The Court previously determined, at the Rule 12(b)(6) stage, that the allegations of continuous water spraying demonstrated a "continuing series of sexually harassing events" sufficient to escape the three year time bar. Doc. No. 43 at 35. The Court also found that Plaintiff's allegation of having been sprayed with water at least three times per week from 2007 until May 2014 was sufficient to state a claim for the tort of outrage. In addition, the Court concluded that SWC could be held liable for IIED based on allegations that several team leaders and managers participated in or witnessed the water spraying and did not stop it. *Id.* at 39–40.

Of course, a different standard applies to the Court's evaluation of the IIED claim at the Rule 56 summary judgment stage. Upon a summary judgment motion, the non-moving party is not saved by mere allegations or denials, assertions and argument in legal briefs, speculation, or conclusory statements. *See, e.g., Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1149 (2013); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The non-movant must come forward with adequate probative evidence that creates a triable controversy. *See* Fed. R. Civ. P. 56(c).

In response to opposing counsel's questions, Plaintiff testified that "Danny" sprayed her with water on one occasion in 2010. She did not complain about the incident. Plaintiff's Dep. at

---

[34] Plaintiff contends that water spraying at work was physically invasive and severely humiliating because it exposed undergarments and the female anatomy.

185, Ex. B (Appx 0099). She stated that Donnie Romero sprayed her with water in 2008, although she did not complain about the conduct. *Id.* at 185–86 (Appx 0099). In addition, she contends that "[Jose] Borjas" sprayed her with water in 2008 and that she complained to Brenda Miller in Human Resources. *Id.* at 186. Ms. Miller told Plaintiff she would issue a letter at work about the water spraying incident but Plaintiff stated that she did not recall seeing a letter. *Id.* Plaintiff then recanted since she had prepared an earlier affidavit stating that she had received a letter from Ms. Miller prohibiting water spraying. *Id.* at 188–89 (Appx 0099–0100). Plaintiff testified that she never complained to anyone about water spraying at work after 2008. *Id.* at 189–190 (Appx 0100).

In response to her attorney's recitation of allegations from the Complaint, Plaintiff remembered that she had seen Donnie Romero, Ricardo Rivas, Jose Borjas, and Johnny Ortiz, all team leaders or managers at SWC, hose down female employees' shirts so as to expose their undergarments. *Id.* at 260 (Appx 0111A). *See also* SAC ¶ 36i. Plaintiff agreed with counsel that this conduct occurred in July 2007. *Id.* And, notwithstanding her earlier testimony about Mr. Romero having sprayed her in 2008, Plaintiff agreed with counsel that Donnie Romero sprayed her with water an average of at least three times a week during Plaintiff's employment at SWC until May 2014. *Id.*

In addition to Plaintiff's testimony about water spraying at work, Plaintiff provides an affidavit from Misty English, who was employed at SWC from 2005 until January 2011. English Aff. ¶ 1, Ex. 15 (Appx 0252). Ms. English states that Donnie Romero made continuous inappropriate sexual comments to her and that he sprayed Ms. English's shirt with water once or twice a month so that he could see the outline of her nipples. According to Ms. English, Mr. Romero sprayed other women at work although her affidavit does not mention Plaintiff.

Had Plaintiff come forward with evidence of continuous water spraying for a period of seven years, the Court would have allowed the IIED claim to proceed. However, like most of Plaintiff's allegations, she starts out strong, but when pushed to the evidentiary test, she fizzles out. First, Plaintiff contends that Mr. Romero sprayed her and other women for a continuous seven year period, and yet, Mr. Romero was not employed by SWC from mid-2009 to mid-2011. Jackson Aff. ¶ 33, Ex. A (Appx 0009). Next, Plaintiff contradicts her strong-sounding allegations about continuous water spraying asserted in her SAC, ¶ 36i–v, with her own testimony that three different individuals had sprayed water on her or other women in 2008 and 2010. She alleges in her SAC that she reported the misconduct on at least one occasion and claims SWC did not follow up.  In contrast, she testified -- as she must (in accordance with earlier sworn testimony she gave in an affidavit) -- that SWC did issue a letter prohibiting the objectionable conduct. There simply is no evidence in the record, other than Plaintiff's self-serving and contradictory testimony, of water spraying after 2010. Plaintiff's attorney's recitation of allegations from the SAC is not a substitute for actual evidence. The Court concludes that Plaintiff has not offered evidence to support a continuing tort of outrage sufficient to excuse the three-year limitations period. Thus, the Court will not consider Plaintiff's allegations of water spraying from 2008 and 2010 or Ms. English's testimony about water spraying before early 2011. Consequently, Plaintiff has not offered any evidence within the limitations period of water spraying to support the IIED claim.

3.     _Allegations of Other Sexual Misconduct and Sexually Offensive Language_

Plaintiff does not contend that employees at SWC referred to her with sexually offensive language or that anyone grabbed her inappropriately.[35] Instead, she supplies affidavit testimony by two former SWC employees regarding Mr. Romero's inappropriate sexual conduct and language. Felipe Alvarado, Aff., Ex. 16 (Appx 0255); Rebecca Martinez Aff., Ex. 22 (Appx 0278). Mr. Alvarado worked for about four years at SWC until 2010. _Id._ ¶ 1. He claims to have witnessed inappropriate language and conduct by Mr. Romero and others. His affidavit does not mention Plaintiff. _Id._ ¶¶ 4, 5.

However, Ms. Martinez stated that Mr. Romero frequently and continuously used crude language in front of her and Plaintiff. Martinez Aff. ¶ 7. Ms. Martinez claims to have been the victim of Mr. Romero's sexual harassment. _Id._ ¶¶ 5–9. Most of Ms. Martinez's allegations about Mr. Romero appear to relate to the time period of 2008 and 2009. _See id._ ¶¶ 5–9. She did not work for SWC after April 2011. _Id._ ¶ 1.

In addition to these two former employees' affidavits, Plaintiff attaches as exhibits SWC's corrective action forms regarding discipline that Mr. Romero received in 2008 and 2009 related to inappropriate sexual conduct at work, Exhibits 17 and 18 (Appx 0259–260), Mr. Romero's April 2011 applications for re-employment at SWC, Ex. 21 (Appx 0275), and Mr. Romero's 2014 and 2015 state court criminal records regarding criminal sexual contact charges of minors, Exhibit 20 (Appx 0263–0274).

As stated, Mr. Alvarado did not work at SWC after 2010, and Ms. Martinez worked for SWC only until April 2011. The Court concludes that their testimony about sexual misconduct reflects discrete instances of conduct that predate the limitations period. Therefore, the Court will

---

[35] While this statement is true with respect to Plaintiff's Response to the Motion for Summary Judgment, she previously argued that she was "grabbed from behind" on two occasions in 2007. But, the Court already determined that these were discrete instances of conduct that were time-barred. Doc. No. 44 at 11.

not consider their affidavit testimony. The Court also finds that Mr. Romero's employment or criminal court records are not relevant to Plaintiff's claims.[36]

After considering all of Plaintiff's relevant evidence that describes conduct within the applicable three year limitations period, the Court determines that Plaintiff has failed to raise a genuine dispute of material fact sufficient to show behavior that is so extreme or outrageous "as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." Therefore, the Court will dismiss the IIED claim (Count H) with prejudice.

VI.    Negligent Supervision (Count I)

Under New Mexico law, "[a]n individual or entity may be held liable in tort for negligent hiring, negligent supervision, or negligent retention of an employee even though it is not responsible for the wrongful acts of the employee under the doctrine of respondeat superior," which makes employers liable only for intentional wrongful acts committed by their employees. See Los Ranchitos v. Tierra Grande, Inc., 116 N.M. 222, 228 (1993). "The torts of negligent hiring and negligent retention of an employee are based on the act or omission of the employer," with liability in New Mexico premised upon "the 'knew or should have known' standard." See F & T Co. v. Woods, 92 N.M. 697, 699 (1979). In sum, in order to survive summary judgment on her negligent supervision claim, Plaintiff must show that a genuine issue of material fact exists as to whether: (1) SWC knew or should have known that failure to supervise a certain employee would create an unreasonable risk of injury to other employees; (2) SWC failed to use ordinary care in supervising the employee; (3) SWC's negligence in supervising or retaining an employee caused Plaintiff's injury. See NMRA, Civ. UJI 13–1647. In its previous opinion, the Court

---

[36] In view of the evidence that Mr. Romero was disciplined for inappropriate sexual conduct in 2008 and 2009, the Court has no idea why SWC decided to re-employ him in 2011. However, the Court is not asked to answer that question, nor was sufficient relevant evidence offered regarding SWC's re-employment of Mr. Romero.

limited the negligent supervision claim to the alleged water spraying incidents. Doc. No. 43 at 41–42. *See* Doc. No. 44 at 11.

It is unclear whether Plaintiff has abandoned her claim that SWC negligently supervised Mr. Romero, but it is clear that Plaintiff failed to set forth in her Response any separate argument specific to this claim. Plaintiff devoted seven pages of argument, Response at 25–32, to five different claims: (1)  "ADEA," (2) "There was an Implied in Fact Contract," (3) "There are Material Issues of Fact Regarding Retaliation," (4) "Ms. Hartwell's § 1981 Failure to Promote Claim," and (5) "Intentional Infliction of Emotional Distress." Noticeably missing is any explicit discussion of the negligent supervision claim.

While the Court might be able to scour the Response and the evidence to find a sentence or two in support of the negligent supervision claim, the Court is not required to become Plaintiff's advocate. *See Adler*, 144 F.3d at 672 (observing that the court is not required to construct arguments for a party and is "wary of becoming [an] advocate [ ] who comb[s] the record of previously available evidence and make[s] a party's case for it.") (citations omitted). Because Plaintiff has presented no evidence to identify a genuine dispute of material fact to show that SWC was negligent in supervising an employee, the Court will dismiss the Negligent Supervision claim (Count I) with prejudice.

### SWC's Motion to Strike

SWC asks the Court to strike affidavits of Misty English, Felipe Alvarado, and Rebecca Martinez, and also to strike attached employment and criminal records of Donnie Romero. Plaintiff's Exhibits 15–18, 20–23. SWC argues, *inter alia*, that the three affidavits consist of time-barred and irrelevant testimony and that another federal judge in the District of New Mexico District previously struck all three affidavits as inadmissible summary judgment

evidence. Motion to Strike at 8 (*citing Martinez v. SWC*, No. CIV 12-660 KG/WPL). SWC also asserts Donnie Romero's records are irrelevant. Plaintiff proposes, in part, that the Court treat summary judgment evidence of the non-movant "indulgently." Response to Motion to Strike at 1.

The Court has reviewed the Motion to Strike, Plaintiff's Response to the Motion, and SWC's Reply, along with the pertinent evidence. Because the Court either did not rely on the challenged evidence or found it irrelevant to the claims, the Court will deny the Motion to Strike as moot.

IT IS THEREFORE ORDERED that:

(1)   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT (Doc. No. 54) is GRANTED in part and DENIED in part, with the result that, in a separate PARTIAL SUMMARY JUDGMENT, the Court will dismiss, with prejudice, Plaintiff's claims of:

   a.   ADEA Discrimination (Count K);

   b.   42 U.S.C. § 1981 Race Discrimination (theories of Failure to Promote, Disparate Treatment, and Wrongful Discharge) (Count J);

   c.   Breach of Employment Contract (Count F);

   d.   Retaliatory Discharge (Count G);

   e.   Intentional Infliction of Emotional Distress (Count H);

   f.   and Negligent Supervision (Count I).

(2)   Plaintiff's 42 U.S.C. § 1981 Claim of Race-Based Hostile Work Environment (Count J) will proceed to a trial; and

(3)        DEFENDANT'S MOTION TO STRIKE SUMMARY JUDGMENT

EVIDENCE (Doc. No. 66) is DENIED as moot.


_____
SENIOR UNITED STATES DISTRICT JUDGE